**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:    Justices:
Marilyn Kelly    Michael F. Cavanagh
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway

FILED MAY 26, 2010

In re MASON, Minors.

_____

DEPARTMENT OF HUMAN SERVICES,

      Petitioner-Appellee,

v                                     No. 139795

RICHARD MASON,

      Respondent-Appellant,
and

CLARISSA SMITH,

      Respondent.

BEFORE THE ENTIRE BENCH

CORRIGAN, J.

We reverse the judgment of the Court of Appeals, which affirmed the circuit court's order terminating the parental rights of Richard Mason, the respondent-father (respondent), to his two sons, J. and C. The circuit court committed several legal errors and the Department of Human Services (DHS) failed in its duties to engage respondent in the proceedings against him. First, the court and the DHS failed to facilitate respondent's participation in the child protective action by telephone in light of his incarceration, as

required by MCR 2.004. The DHS further abandoned its statutory duties to involve him in the reunification process and to provide services necessary for him to be reunified with his children. The court effectively terminated respondent's parental rights merely because he was incarcerated during the action without considering the children's placement with relatives or properly evaluating whether placement with respondent could be appropriate for the children in the future. Incarceration alone is not a sufficient reason for termination of parental rights. Accordingly, we reverse and remand the case to the circuit court for further proceedings consistent with this opinion.

## I. FACTS AND PROCEEDINGS

Respondent is the father of J., born March 13, 2004, and C., born December 12, 2006. Clarissa Smith is the boys' mother. The parents were never married, but respondent testified that they shared responsibility for J.'s care. The DHS's Child Protective Services (CPS) program first became involved with the family in April 2006; it provided services to Smith, but never to respondent. Until respondent was jailed for drunk driving in October 2006, shortly before C.'s birth, he did construction work to support the family.

While respondent was in jail, Smith brought the boys to visit him every week. On June 19, 2007, the DHS temporarily removed J. and C. from Smith's care. CPS had investigated Smith after the police found J. wandering outside the home unsupervised. The removal petition filed by the DHS also accused respondent of neglect, citing his

2

criminal history and alleging that he "has failed to provide for the children physically, emotionally and financially."

The court authorized the petition on June 20, 2007, at a hearing where respondent was represented by court-appointed counsel. The court notified respondent that the children had been removed and arranged for him to participate by telephone in a July 24, 2007, pretrial hearing. At the July 24 hearing, both respondent and Smith pleaded no contest to the allegations in the petition. The DHS planned to provide services to Smith with a goal of reunification. With regard to respondent, the court ordered supervised visits following his anticipated release from jail.

The DHS foster care worker, Steven Haag, later created a parent-agency treatment plan and service agreement (the "service plan") requiring respondent and Smith to submit to substance-abuse and psychological assessments, complete parenting classes, maintain contact with the children, and establish legal sources of income and suitable homes. The court adopted the service plan with regard to both parents at an August 14, 2007, hearing, at which respondent was not present.[1] Smith had requested placement of the children with respondent's family and the court ordered placement with the children's paternal aunt and uncle.

Respondent's incarceration did not end in August 2007 as expected, however. Rather, when his jail term expired, he was sentenced to prison for a prior larceny

---

[1] It is unclear from the record whether the DHS provided a copy of the service plan to respondent.

3

conviction because the drunk driving conviction violated his probation conditions. Respondent's earliest release date became July 1, 2009. The court then restricted his contact with the children to cards or letters. Although the DHS and the court knew of respondent's incarceration, they did not include him in subsequent hearings on November 13, 2007, February 11, 2008, May 8, 2008, July 8, 2008, and October 7, 2008. Nor did they inform him of his right under MCR 2.004 to participate in hearings by telephone. At the July 8, 2008, hearing, respondent—who had corresponded with his attorney— expressed through counsel that he was "extremely concerned with what is going on with this case." He "truly want[ed] what's best for [his] children, as well as to be a part of their lives." He did "very much want to be a part of any and all court proceedings." His request to participate was apparently overlooked.

Finally, more than 16 months after he last participated, the court arranged for respondent to participate by phone in the December 3, 2008, permanency planning hearing. DHS worker Haag acknowledged at the hearing that respondent had provided proof that he completed an educational class and a business education technology course while in prison. Respondent also attended weekly Alcoholics Anonymous meetings and was on waiting lists for enrollment in parenting classes and counseling. But Smith had tested positive for drugs and acknowledged that her current residence was not suitable for her sons. Because the boys had been in care for almost 18 months, Haag contended that both parents' rights should be terminated. Both parents objected. Respondent's attorney observed that respondent was doing what he could and might be released by July 2009.

The court nevertheless authorized the termination petition. Smith did not appear for the termination hearing and has not appealed. With regard to respondent, the entirety of the petition's allegations was as follows:

> Mr. Mason has been in prison since the boys were removed. His earliest release date is July 2009 and he could be incarcerated until July 2016. During his current incarceration, Mr. Mason has been participating in weekly 12-step meetings and completed a Business Education Technology program. He is waiting to be enrolled in parenting classes.

The petition sought termination of respondent's rights on the following grounds listed in MCL 712A.19b(3):

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds . . . :
>
> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.
>
> * * *
>
> (g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.
>
> (h) The parent is imprisoned for such a period that the child will be deprived of a normal home for a period exceeding 2 years, and the parent has not provided for the child's proper care and custody, and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.
>
> * * *
>
> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

5

At the February 3, 2009, termination hearing, respondent opposed termination because of his imminent release from prison. He requested a one-month adjournment until March 2009 to ascertain whether the parole board would release him the following July. The children's attorney supported respondent's request to adjourn to assess the situation since the children were living with respondent's family. Respondent had arranged a construction job with his brother and housing with his mother in anticipation of his release from prison.

Only Haag and respondent testified at the hearing. Haag candidly admitted that he had never spoken with respondent. Haag stated that respondent had not provided verification of completion of any programs required by the service plan. In particular, respondent had not completed a substance-abuse program or received an evaluation by a psychologist. Haag opined that termination was in the children's best interests because, even if respondent were to be released from prison in July 2009, it would take him another six months to comply with the service plan and his parole conditions.

Respondent testified regarding the classes he completed in prison. He was not using drugs or alcohol, as a drug test confirmed. He stated that a prisoner could not request a psychological evaluation. He did paid work while in prison. With regard to his criminal past, he explained that a 1997 criminal sexual conduct conviction involved consensual sexual behavior with his 16-year-old girlfriend when he was 17. He also described brief jail sentences and probationary periods resulting from this and his other past offenses. Finally, respondent expressed his desire to care for his sons. He had

6

employment with his brother waiting for him upon his release.  He planned to live with his mother, who had a three-bedroom home with "substantial room for the boys."

The court nonetheless terminated respondent's parental rights on the basis of each of the grounds alleged.  It faulted him because he had not personally cared for the children for at least the past two years.  And his incarceration precluded him from taking advantage of services offered by the DHS.  Even if he were to be released in July, the court concluded that he would need at least 6 months to comply with the service plan and bond with the children, requiring at least 11 more months in state-supervised care for the children after the termination hearing.

Respondent appealed as of right.  The Court of Appeals affirmed in a memorandum opinion. *In re Mason*, unpublished memorandum opinion of the Court of Appeals, issued September 15, 2009 (Docket No. 290637).[2]  On December 3, 2009, we granted oral argument to consider whether to grant leave to appeal or take other peremptory action.

## II. STANDARD OF REVIEW

We review for clear error a trial court's factual findings as well as its ultimate determination that a statutory ground for termination of parental rights has been proved by clear and convincing evidence.  MCR 3.977(J); *In re Trejo Minors*, 462 Mich 341,

---

[2] Because it is relevant to the relief available in this case, we note that respondent was paroled on September 22, 2009, one week after the Court of Appeals issued its opinion.

7

356-357; 612 NW2d 407 (2000). "'A finding is "clearly erroneous" [if] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made.'" *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989) (citation omitted). We review de novo the interpretation and application of statutes and court rules. *Estes v Titus*, 481 Mich 573, 578-579; 751 NW2d 493 (2008).

## III. ANALYSIS

The state is not relieved of its duties to engage an absent parent merely because that parent is incarcerated. In this case, once again, the DHS's efforts focused exclusively on the custodial mother and essentially ignored the father. "Reasonable efforts to reunify the child and family must be made in *all* cases" except those involving aggravated circumstances not present in this case. MCL 712A.19a(2) (emphasis added). Here, because the DHS and the court failed to adhere to court rules and statutes, respondent was not afforded a meaningful and adequate opportunity to participate. Therefore, termination of his parental rights was premature.

## A. THE RIGHT TO PARTICIPATE BY TELEPHONE UNDER MCR 2.004

MCR 2.004 requires the court and the petitioning party to arrange for telephonic communication with incarcerated parents whose children are the subject of child protective actions. See MCR 2.004(A) to (C). The express purposes of the rule include ensuring "adequate notice . . . and . . . an opportunity to respond and to participate," in

8

part by determining "how the incarcerated party can communicate with the court . . . during the pendency of the action, and whether the party needs special assistance for such communication, including participation in additional phone calls." MCR 2.004(E)(1) and (4). The court must consider "the scheduling and nature of future proceedings, to the extent practicable, and the manner in which the incarcerated party may participate." MCR 2.004(E)(5). Significantly, MCR 2.004(F) provides:

> A court may not grant the relief requested by the moving party concerning the minor child if the incarcerated party has not been offered the opportunity to participate in the proceedings, as described in this rule. This provision shall not apply if the incarcerated party actually does participate in a telephone call . . . .

Although the court here arranged for respondent to participate in the July 24, 2007, pretrial hearing, no one informed him of his right to continue to participate in the proceedings with facilitation by the court.[3] The court and the DHS were well aware that respondent was in prison and thus needed "special assistance"[4] to participate in "future proceedings."[5] Yet the court arranged for respondent's phone participation in only one additional proceeding before the termination hearing—the December 3, 2008, permanency planning hearing.

---

[3] Even respondent's appointed attorney appears not to have recognized the court's duty to facilitate respondent's participation by phone. The attorney reported merely informing respondent by letter that "perhaps" respondent's participation could be arranged.

[4] MCR 2.004(E)(4).

[5] MCR 2.004(E)(5).

When a respondent is not "offered the opportunity to participate in the proceedings," MCR 2.004(F) prohibits the court from granting the moving party's request for relief unless the respondent actually participated in "a telephone call." The DHS argues that the protection of MCR 2.004(F) is not applicable here because respondent participated in two telephone calls—at the July 24, 2007, pretrial hearing and the December 3, 2008, permanency planning hearing. We disagree.

A child protective action such as this consists of a series of proceedings, including a preliminary hearing at which the court may authorize a petition for removal of a child from his home, MCL 712A.13a(2), review hearings to evaluate the child's and parents' progress, MCL 712A.19, permanency planning hearings, MCL 712A.19a, and, in some instances, a termination hearing, MCL 712A.19b.[6] Each proceeding generally involves different issues and decisions by the court. Thus, to comply with MCR 2.004, the moving party and the court must offer the parent "the opportunity to participate in" each proceeding in a child protective action. For this reason, participation through "a telephone call" during one proceeding will not suffice to allow the court to enter an order at another proceeding for which the parent was not offered the opportunity to participate.

This case illustrates the point well. Although respondent participated by phone in the July 24, 2007, pretrial hearing, he was not offered the opportunity to participate in the

_____

[6] Child protective actions, in general, are also divided into two "phases": the adjudicative phase, during which the trial court determines whether it "may exercise jurisdiction over the child," and the dispositional phase, during which the court "determines what action, if any, will be taken on behalf of the child." *In re Brock*, 442 Mich 101, 108; 499 NW2d 752 (1993).

10

review or permanency planning hearings held from August 2007 through July 2008. By the time respondent participated in the December 3, 2008, permanency planning hearing—16 months after he last participated—the court and the DHS were ready to move on to the termination hearing. Thus, respondent missed the crucial, year-long review period during which the court was called upon to evaluate the parents' efforts and decide whether reunification of the children with their parents could be achieved. Indeed, respondent was practically excluded from almost every element of the review process, as is further detailed below.

In sum, respondent was not "offered the opportunity to participate in the proceedings," MCR 2.004(F), by the moving party and the court as required by MCR 2.004(B).[7] Further, he did not actually participate in a telephone call relevant to each proceeding. Although he participated in two calls before the termination hearing, neither call took place during the review period when the DHS made efforts to reunify the children with their parents. Accordingly, the court was precluded from granting the relief requested by the moving party at the close of the review period—specifically, the DHS's request for termination of respondent's parental rights. Respondent's absence affected both his ability to participate and the information available for the court's consideration.

---

[7] MCR 2.004(B) imposes several specific duties, including the moving party's duties to notify the respondent, contact the department of corrections, and notify the court that telephonic participation is required. The court must then order the department to make arrangements for the call.

11

Accordingly, as will be discussed, the circuit court's resultant findings in relation to the statutory grounds for termination were clearly erroneous.

## B. STATUTORY RIGHTS TO PARTICIPATE IN THE DHS SERVICE PLAN

The failures of the DHS and the court also directly violated their statutory duties. If the court orders placement of a child outside the child's home, the DHS must prepare an initial services plan within 30 days of the child's placement. MCL 712A.13a(8)(a). Before the court enters an order of disposition, the DHS must prepare a case service plan, which must include, among other things, a "[s]chedule of services to be provided to the parent, child, and if the child is to be placed in foster care, the foster parent, to facilitate the child's return to his or her home or to facilitate the child's permanent placement." MCL 712A.18f(3)(d). "If a child continues in placement outside of the child's home, the case service plan shall be updated and revised at 90-day intervals . . . ." MCL 712A.18f(5). Further, at each review hearing, the court is required to consider, among other things, "[c]ompliance with the case service plan with respect to services provided or offered to the child and the child's parent, . . . whether the parent . . . has complied with and benefited from those services," and "[t]he extent to which the parent complied with each provision of the case service plan, prior court orders, and an agreement between the parent and the agency." MCL 712A.19(6)(a) and (c). The court may then modify the case service plan, including by "[p]rescribing additional services" and "[p]rescribing additional actions to be taken by the parent . . . to rectify the conditions that caused the child to be placed in foster care or to remain in foster care." MCL 712A.19(7)(a) and (b).

12

The only documented service plan in this case listed respondent's obligations and stated that the DHS "worker will refer the family to the appropriate agencies in order to meet the goals" of the service plan. It is unclear, however, whether the DHS sent a copy of the service plan to respondent; although a copy appears in the circuit court record, the section reserved for respondent's signature is notably blank. In any event, neither Haag nor the court ever facilitated respondent's access to services and agencies or discussed updating the plan. Although Haag testified that as a matter of general policy the DHS "tr[ies] to make contact with the prison social worker that might be able to help [a respondent] fulfill some of [the service plan requirements] and get into the services in the prison," Haag did not assert that he complied with this policy here. At a minimum, there is no evidence that Haag spoke to a prison social worker about respondent's need for services. Indeed, Haag admitted that respondent could not comply with the service plan as written while in prison, but provided no explanation for his failure to update the plan or to contact respondent,[8] particularly after Smith's noncompliance with the plan became

---

[8] Failures such as these by the caseworker do not only prejudice parents' rights. The DHS's deficiencies in these regards can be the cause of millions of dollars in federal funding losses as a penalty for failing to meet state child welfare requirements addressed by the United States Department of Health and Human Services Child and Family Services review (CFSR) and review under subchapter IV, part E, of the United States Social Security Act, 42 USC 670 *et seq.*, which provides significant funds for Michigan's foster care system. See 42 USC 674(d) (providing a system for reducing a state's funding as a penalty for noncompliance with program requirements). Indeed, on March 2, 2010, the Children's Bureau of the federal Administration for Children and Families informed the DHS that Michigan's noncompliance with federal requirements will result in an estimated minimum funding loss of $2,836,189 for fiscal year 2009 if the failures are not remedied through a program improvement plan. See the letter from Joseph L. Bock, Acting Associate Commissioner, Children's Bureau, Administration for Children and

evident. Haag first reported Smith's noncompliance and the DHS's intent to seek termination at the December 3, 2008, permanency planning hearing. Yet the DHS and the court still failed to address respondent's right to services or updating the service plan. Respondent's parental rights were terminated a mere two months later, on February 3, 2009.

Under these circumstances, the circuit court was required to consider MCL 712A.19a(6), which provides:

> If the court determines at a permanency planning hearing that a child should not be returned to his or her parent, the court may order the agency

Families, United States Department of Health and Human Services, to Ismael Ahmed, Director, Michigan Department of Human Services (March 2, 2010) (on file with the author and the recipient); the memorandum from Kelly Howard, Michigan State Court Administrative Office, regarding the 2009 CFSR final report (March 18, 2010), available at <http://courts.michigan.gov/scao/services/CWS/CFSR-Memo03-10.pdf> (accessed May 25, 2010). As is reflected in the current DHS Childrens Foster Care Manual (also called the "FOM"): "Casework service **requires** the engagement of the family in development of the service plan. This engagement must include an open conversation between all parents/guardians and the [foster care] worker . . . ." FOM 722-6, p 1 (emphasis in original). The FOM is publicly available at <http://www.mfia.state.mi.us/olmweb/ex/ fom/fom.pdf> (accessed May 25, 2010). Indeed, the

> family is to be extensively involved in case planning and have a clear understanding of all the conditions which must be met prior to the child's return home, how these relate to the petition necessitating removal, and what the supervising agency will do to help the family meet these conditions. [*Id.* at 1-2.]

Further, "[i]f the parents are not involved in developing or refuse to sign the case plan, the reasons must be documented . . . ." *Id.* at 2. "The [foster care] worker must also identify and document additional actions needed to secure the parent's participation in service planning and compliance with the case plan." *Id.* Haag clearly did not take any of these actions here, and respondent's signature is conspicuously absent from the service plan.

to initiate proceedings to terminate parental rights. Except as otherwise provided in this subsection, if the child has been in foster care under the responsibility of the state for 15 of the most recent 22 months, the court shall order the agency to initiate proceedings to terminate parental rights. *The court is not required to order the agency to initiate proceedings to terminate parental rights if 1 or more of the following apply*:

\* \* \*

(c) The state has not provided the child's family, consistent with the time period in the case service plan, with the services the state considers necessary for the child's safe return to his or her home, if reasonable efforts are required. [Emphasis added.]

Although the initial conditions of MCL 712A.19a(6) were met—the children could not yet be returned to respondent and they had been placed out of their home for more than 15 months—the court and the DHS failed to consider that respondent had *never* been evaluated as a future placement or provided with services. Rather, the DHS had focused on its attempts to reunify the children with Smith and, in doing so, disregarded respondent's statutory right to be provided services and, as a result, extended the time it would take him to comply with the service plan upon his release from prison—which was potentially imminent at the time of the termination hearing. The state failed to involve or evaluate respondent, but then terminated his rights, in part because of his failure to comply with the service plan,[9] while giving him no opportunity to comply in the future.

---

[9] MCL 712A.19a(5) provides for the court's consideration of a parent's failure to comply with a service plan as follows:

[T]he court shall view the failure of the parent to substantially comply with the terms and conditions of the case service plan prepared under [MCL 712A.18f] as evidence that return of the child to his or her parent would cause a substantial risk of harm to the child's life, physical health, or mental well-being.

15

This constituted clear error. As we observed in *In re Rood*, a court may not terminate parental rights on the basis of "circumstances and missing information directly attributable to respondent's lack of meaningful prior participation." *In re Rood*, 483 Mich 73, 119; 763 NW2d 587 (2009) (opinion by CORRIGAN, J.); see also *id.* at 127 (YOUNG, J., concurring in part) (stating that, as a result of the respondent's inability to participate, "there is a 'hole' in the evidence on which the trial court based its termination decision").

## C. INCARCERATION ALONE IS NOT GROUNDS FOR TERMINATION

As the earlier discussion suggests, the state's failures in this case (which are all too common in this type of case) appear to stem primarily from the fact of respondent's incarceration. Not only did the state fail to properly include him in the proceedings, but the circuit court's ultimate decision in the case was replete with clear factual errors and errors of law that essentially resulted in the termination of respondent's parental rights solely because of his incarceration.[10] The mere present inability to personally care for one's children as a result of incarceration does not constitute grounds for termination.

---

[10] Notably, the termination petition practically confirms that the state was focused almost exclusively on the mere fact of respondent's incarceration. Two of the scant four sentences in the petition containing allegations against him state: "Mr. Mason has been in prison since the boys were removed. His earliest release date is July 2009 and he could be incarcerated until July 2016." The other two sentences do not establish grounds for termination; to the contrary, they appear to weigh in respondent's favor: "During his current incarceration, Mr. Mason has been participating in weekly 12-step meetings and completed a Business Education Technology program. He is waiting to be enrolled in parenting classes."

16

MCL 712A.19b(3)(h) authorizes termination only if *each* of three conditions is met:

> The parent is imprisoned for such a period that [1] the child will be deprived of a normal home for a period exceeding 2 years, *and* [2] the parent has not provided for the child's proper care and custody, *and* [3] there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age. [Emphasis added.]

The combination of the first two criteria—that a parent's imprisonment deprives a child of a normal home for more than two years *and* the parent has not provided for proper care and custody—permits a parent to provide for a child's care and custody *although the parent is in prison*; he need not *personally* care for the child.[11] The third necessary condition is forward-looking; it asks whether a parent "will be able to" provide proper care and custody within a reasonable time. Thus, a parent's past failure to provide care

---

[11] Michigan traditionally permits a parent to achieve proper care and custody through placement with a relative. *In re Taurus F*, 415 Mich 512, 535; 330 NW2d 33 (1982) (opinion by WILLIAMS, J.) (equally divided decision) ("[I]f a mother gives custody to a sister, that can be 'proper custody'."); *In re Maria S Weldon*, 397 Mich 225, 296; 244 NW2d 827 (1976) (opinion by LEVIN, J.) ("Some parents, . . . because of illness, incarceration, employment or other reason, entrust the care of their children for extended periods of time to others. This they may do without interference by the state as long as the child is adequately cared for."), overruled in part on other grounds by *Bowie v Arder*, 441 Mich 23, 47; 490 NW2d 568 (1992); *In re Curry*, 113 Mich App 821, 823-826; 318 NW2d 567 (1982) (observing that incarcerated parents may achieve proper custody by placing a child with relatives); *In re Carlene Ward*, 104 Mich App 354, 360; 304 NW2d 844 (1981) (holding that a child "who was placed by her natural mother in the custody of a relative who properly cared for her, is not a minor 'otherwise without proper custody or guardianship' and thus she was not subject to the jurisdiction of the probate court" under MCL 712A.2). Michigan's Estates and Protected Individuals Code includes an extensive statutory scheme designed to establish guardians for minors—including guardians who are relatives—by appointment of the court *or by appointment of the minor's parents*. MCL 700.5201 *et seq.*

because of his incarceration also is not decisive.[12] The court here failed to consider these provisions separately in at least three regards.

First, as discussed in part earlier, the court failed to account for the fact that the DHS did not seek termination of respondent's or Smith's parental rights until December 3, 2008. At that time, respondent anticipated being paroled in less than two years; indeed, he was paroled less than one year later, on September 22, 2009.

Second, on a related point, the court clearly erred by concluding, on the basis of Haag's largely unsupported opinion, that it would take at least six months for respondent to be ready to care for his children after he was released from prison. As noted, throughout the proceedings the DHS and the court failed to evaluate respondent's parenting skills or facilitate his access to services.[13] Accordingly, as previously discussed, the court's conclusion that respondent could not care for his children within a

---

[12] The Court of Appeals consistently adheres to this approach, having stated that the trial court must consider "whether the imprisonment will deprive a child of a normal home for two years in the future, and not whether past incarceration has already deprived the child of a normal home." *In re Neal*, 163 Mich App 522, 527; 414 NW2d 916 (1987). See also *In re Perry*, 193 Mich App 648, 650; 484 NW2d 768 (1992), quoting *Neal*, 163 Mich App at 527, on this point.

[13] The state also arguably contributed to respondent's lack of a current bond with his children; although the children had previously visited him weekly in jail, on the DHS's recommendation the court prohibited even phone contact with them when he was imprisoned again. The court may have reasonably foreclosed further in-person visits given that, when he was reimprisoned, respondent was relocated to a facility in the Upper Peninsula. But the failure to permit phone contact absent proof that contact would harm the children appears to have violated MCL 712A.13a(11), which establishes that, until a petition for termination is filed, the court must permit "the juvenile's parent to have frequent parenting time" unless visits, "even if supervised, may be harmful to the juvenile . . . ."

18

reasonable time in the future was improperly rooted in "circumstances and missing information directly attributable to respondent's lack of meaningful prior participation." *Rood*, 483 Mich at 119 (opinion by CORRIGAN, J.); see also *id.* at 127 (YOUNG, J., concurring in part). Moreover, respondent *did* engage in activities while in prison that amounted to compliance with elements of the service plan.[14] In Haag's own words at the December 3, 2008, permanency planning hearing, "[W]e do have some of what's expected of him." Respondent also remained in contact with his children through cards and arranged for a home and legal income upon his release from prison. Under these circumstances, the court erred when it accepted Haag's opinion at the termination hearing that respondent had utterly failed to comply with the service plan—a plan that he may not have received in the first place—and had no hope of complying within a reasonable time given the children's ages.[15]

---

[14] It is impossible to tell from the record before us whether respondent was purposefully acting to comply with the service plan, sought out services simply for his own edification, or acted on the advice of counsel to improve his prospects of regaining custody of his children.

[15] Moreover, the court made several factual errors when it considered the length of the child protective proceedings. The children had been in state-supervised care ("in care") for about 20 months at the time of the termination hearing—from June 2007 through February 2009. For most of that time, they were living with respondent's family. Yet the court stated that, even if respondent were to be released from prison in July 2009—five months after the termination hearing—and then it took six months for him to comply with the service plan, the boys would have been in care for a total of four years. Actually, under this scenario the boys would have been in care for 31 months—just over 2½ years. The court further stated that, at the time of the termination hearing, C. was three years old and J. was almost six years old. Actually, C., who had been removed from his mother's care when he was six months old, was two years old and J. was four years old.

Third, the court never considered whether respondent could fulfill his duty to provide proper care and custody in the future by voluntarily granting legal custody to his relatives during his remaining term of incarceration. At Smith's request, the children had already been successfully placed with respondent's family—presumably the very people with whom respondent would have voluntarily placed them had the DHS not already taken custody of them by the time respondent was notified of Smith's neglect. This being the case, it was unnecessary for respondent to make ongoing arrangements with the relatives that would permit him to preserve his rights and remain in contact with his sons.[16]

Indeed, a child's placement with relatives weighs against termination under MCL 712A.19a(6)(a), which expressly establishes that, although grounds allowing the initiation of termination proceedings are present, initiation of termination proceedings is not required when the children are "being cared for by relatives." Thus the boys' placement with respondent's family was an explicit factor to consider in determining whether termination was in the children's best interests, yet placement with relatives was never considered in this regard.

Finally, we turn to the substance of the other grounds for termination. Under MCL 712A.19b(3)(c)(*i*), the DHS must show by clear and convincing evidence that "182 or more days have elapsed since the issuance of an initial dispositional order," that the "conditions that led to the adjudication continue to exist," and that "there is no reasonable

---

[16] It is troubling that even respondent's lawyer did not raise this point.

likelihood that the conditions will be rectified within a reasonable time considering the child's age." Under MCL 712A.19b(3)(g), the DHS must show that "[t]he parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age." As under MCL 712A.19b(3)(h), each of these grounds requires clear and convincing proof that the parent has not provided proper care and custody and will not be able to provide proper care and custody within a reasonable time. As such, these additional grounds are factually repetitive and wholly encompassed by MCL 712A.19b(3)(h). Because the court erred in evaluating whether respondent could care for his children in the future, either personally or through his relatives, termination under MCL 712A.19b(3)(c)(*i*) or (g) was also premature.

The only other ground alleged for termination was that in MCL 712A.19b(3)(j): "There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." Termination on this ground was clearly erroneous because no evidence showed that the children would be harmed if they lived with respondent upon his release. Significantly, just as incarceration alone does not constitute grounds for termination, a criminal history alone does not justify termination. Rather, termination solely because of a parent's past violence or crime is justified only under certain enumerated circumstances, including when the parent created an unreasonable risk of serious abuse or death of a child, if the parent was convicted of felony assault resulting in the injury of one of his own children, or if the parent committed murder, attempted murder, or voluntary manslaughter of one

21

of his own children. MCL 712A.19a(2); MCL 722.638(1) and (2). The DHS did not present any evidence suggesting that respondent had ever harmed a child. Indeed, the errors in this case are particularly troubling given that respondent's criminal history consisted largely of short jail stints for comparatively minor offenses. The record shows that he supported his family before his imprisonment and no evaluation was ever conducted to gauge whether he was likely to offend again.

In sum, the circuit court clearly erred both by failing to correctly apply the text of the relevant statutes and, as did the circuit court in *Rood*, by basing its factual findings on a record that was largely undeveloped because of the state's failures to involve respondent. We do not reach the question whether reversal could be independently required under a due process analysis. Rather, consistent with the majority position in *Rood*, under the circumstances of this case it is enough that the court violated several statutes and court rules. Most significantly, because the court engaged in fact-finding despite the resulting holes in the record, it relieved the DHS of its burden to prove by clear and convincing evidence that grounds for termination were present. MCL 712A.19b(3); *Rood*, 483 Mich at 119 (opinion by CORRIGAN, J.) (noting that a court may not terminate parental rights on the basis of "circumstances and missing information directly attributable to respondent's lack of meaningful prior participation"); *id.* at 123-124 (CAVANAGH, J., concurring in part) (stating that "the trial court clearly erred by determining that the DHS had shown that the statutory grounds for termination were established" when the court and the DHS failed to "fulfill their statutory duties and make reasonable efforts to reunite respondent and his child"); *id.* at 126-127 (YOUNG, J.,

22

concurring in part) ("The failure of the trial court and the DHS to provide adequate notice to respondent was the root of the trial court's erroneous ruling that petitioner had presented clear and convincing evidence in support of the grounds cited in the termination petition . . . . [T]here is a 'hole' in the evidence on which the trial court based its termination decision.").

## IV. RESPONSE TO JUSTICE MARKMAN

Justice MARKMAN aptly observes that respondent has never been an ideal parent. But this fact does not disentitle respondent to the rights afforded him as a parent in a proceeding involving his children's welfare. Centrally, the majority's view differs from that of Justice MARKMAN in that, as we have explained, we cannot conclude that the circuit court and the DHS afforded respondent the rights to which he was entitled under the terms of the relevant statutes and court rules. Thus, the DHS was effectively relieved of its duty to properly prove by clear and convincing evidence that a statutory ground for termination was satisfied.

Justice MARKMAN's result is also premised on his belief that "nobody but respondent can be blamed for the fact that he was in prison during the pendency of these proceedings." As we have explained, and as Justice MARKMAN professes to agree, a parent's rights to his child may not be terminated merely because he is imprisoned and thus unable to personally care for his children. Further, the record belies Justice MARKMAN's claims that respondent never supported his children and "did virtually nothing to demonstrate that he was willing or able to take responsibility for [their] care

23

and custody . . . ." Although we acknowledge respondent's parenting failures, testimony also established that he shared in J.'s care and supported the family by doing construction work before he was imprisoned. Moreover, he arranged for work and housing in anticipation of his parole.

Most significantly, Justice MARKMAN's interpretations of the relevant statutes and court rules appear to endorse the all too common decisions of the DHS and the circuit courts to cut corners by ignoring the mandates of statutes and court rules when a parent is in prison. Justice MARKMAN posits, for example, that a couple of phone calls between respondent and the court—or the letter from respondent's attorney telling him that "perhaps" he could participate further in the proceedings—satisfied the requirements of MCR 2.004 that an imprisoned parent have the "opportunity to respond and to participate" and "communicate with the court . . . during the pendency of the action," including by participating in "additional phone calls . . . ." MCR 2.004(E)(1) and (4). Justice MARKMAN further credits the statement of DHS worker Haag that it would take respondent at least six months after his parole to learn to care for his children; yet Haag admitted that no one from the DHS ever spoke to respondent or evaluated his parenting skills.

The overriding error in this case is the failure—of the court, the DHS, and indeed respondent's attorney—to acknowledge and honor respondent's right to participate. Although respondent must take responsibility for his own past failures, the court's largely uninformed presumption of his unfitness is not a sufficient basis for termination. The court may again conclude on remand, after respondent is given a full opportunity to

24

participate, that termination is appropriate. But it must do so by making proper findings of fact based on respondent's participation in the proceedings.

Finally, there is no reason that the children's lives must be disrupted during the proceedings on remand. Justice MARKMAN fears a "potentially catastrophic" delay in fulfilling the children's need for "a safe, secure, and stable home . . . ." But the children will continue to live with their aunt and uncle—both tomorrow and indefinitely—while respondent works with the court and the DHS to establish his ability to safely parent them. If and when the court so orders, he may begin visiting with the children. Significantly, the aunt and uncle may even retain primary custody through a guardianship if the court concludes that the children should not be returned to respondent but an ongoing relationship with him—rather than termination—is in the children's best interests. See MCL 712A.19a(7)(c). This option adds significance to the court's original failure to consider MCL 712A.19a(6)(a), which establishes that initiation of termination proceedings is not required when the children are "being cared for by relatives" although a parent is not personally able to be a primary caregiver for the children.

## V. CONCLUSION

For these reasons, the court clearly erred by terminating respondent's rights under each of the grounds alleged. Because of the state's failures, termination was premature. In the words of the children's lawyer at the close of the termination hearing, respondent was "trying to fulfill an agreement that never really made any accommodations to the fact that he was hamstrung from the beginning [in] trying to get things in order so that he can

25

one day be a father to these children." Neither the court nor the DHS properly facilitated respondent's right to participate in the proceedings, ensured that he had a meaningful opportunity to comply with a case service plan, or considered the effect of the children's placement with his family. Accordingly, we reverse the judgment of the Court of Appeals, which affirmed the circuit court's order terminating respondent's parental rights, and remand this case to the circuit court for further proceedings consistent with this opinion.

We do not retain jurisdiction.

> Maura D. Corrigan
> Marilyn Kelly
> Michael F. Cavanagh
> Robert P. Young, Jr.

S T A T E   O F   M I C H I G A N

SUPREME COURT

In re MASON, Minors.
_____

DEPARTMENT OF HUMAN SERVICES,

        Petitioner-Appellee,

v                                     No. 139795

RICHARD MASON,

        Respondent-Appellant,

and

CLARISSA SMITH,

        Respondent.
_____

MARKMAN, J. (*dissenting*).

I respectfully dissent from this Court's opinion reversing the Court of Appeals'
affirmance of the order terminating respondent-father's parental rights to his two- and
four-year-old sons. I simply cannot support the majority's conclusion that the trial court
clearly erred by terminating respondent's parental rights. In addition, given that
respondent received *all* the process to which he was *entitled* under the law, I find no "due
process" violation in the fact that the majority is able to identify ways in which he *could*
have been given still more process. The majority, quoting the children's lawyer-guardian
ad litem, asserts that respondent was "'hamstrung from the beginning [in] trying to get
things in order so that he [could] one day be a father to these children.'" However, the

majority disregards two quite significant points. First, to the extent that respondent was "hamstrung," this was of his own making-- nobody but respondent can be blamed for the fact that he was in prison during the pendency of these proceedings. Second, there is no evidence that respondent did *anything* to provide for his children while they were living with their unfit mother, with foster parents, or with their paternal aunt and uncle.[1] Instead, respondent pleaded 'no contest' to the removal petition that alleged that "Mr. Mason has failed to provide for the children physically, emotionally and financially." Indeed, although respondent knew that the children's mother was drinking again even before the court did, he still did nothing to try to protect his children from the precarious situation in which this placed his children. In addition, when he knew that his children were being removed from their mother, he did nothing to prevent them from being placed in foster care even though he had relatives who were willing and able to care for the children.

---

[1] In response to the majority's assertion that respondent "supported" his family *before* he was imprisoned, I must note that respondent testified that, before he was imprisoned, he and his "family" lived in his mother's house, his girlfriend's grandmother's house, and a house owned by his brother. In light of this testimony, it is not entirely clear who supported respondent and his "family"-- respondent or respondent's mother, his girlfriend's grandmother, and his brother. Respondent also has a third child (who was not the subject of the termination proceedings at issue here), and there is no evidence in the record to suggest that respondent has done anything to provide for *this* child either, before or after his imprisonment. Although respondent did at one point write letters to one child while he was in prison, he admitted that he stopped doing even that. To say the least, I do not believe that the trial court clearly erred in its conclusion that the fact that respondent allegedly "arranged for work and housing in anticipation of his parole" was too little, too late.

Despite respondent's repeated failures in these regards, the majority reverses the judgment of the Court of Appeals, which affirmed the trial court's termination of his parental rights, on the basis that the Department of Human Services (DHS) and the trial court did not do enough to help respondent become a better parent. I believe that the majority has it exactly backwards-- respondent is the one who did not do enough to become a better parent. He did virtually nothing to demonstrate that he was willing or able to take responsibility for the care and custody of these children. It is potentially catastrophic for these children that their interest in a safe, secure, and stable home must again be placed in abeyance while respondent is afforded yet another opportunity to become a minimally acceptable parent.[2]

Respondent has been incarcerated since 2006, and although he has now been released on parole, he was still incarcerated both when the trial court terminated his parental rights and when the Court of Appeals affirmed that decision. Respondent has been convicted of criminal sexual conduct, failure to report as a registered sex offender, larceny, and drunk driving (twice). Respondent does not deny that the children's mother, who was caring for the children before the DHS removed them, was an unfit parent. Indeed, respondent admits that "he knew that the mother had fallen off the wagon before the court knew" because "she had called him [and] told him she was drinking again"; yet

---

[2] The majority contends that "there is no reason that the children's lives must be disrupted during the proceedings on remand." Unlike the majority, I believe that not knowing where they may be living *tomorrow* (maybe with their father, maybe with their aunt and uncle, or maybe with new foster parents) very much constitutes a "disruption" in young children's lives.

he did absolutely nothing to protect his children from this situation. Respondent's then two-year-old child was twice found by the police wandering around outside the home completely unsupervised. On one of these occasions, the mother was found inside asleep. She had inadequate housing, substance-abuse issues, problems with depression, no job, and an admitted inability to handle her children. She has been arrested for drunk driving twice and, as a result, has spent time in jail. She also refused to stop smoking around the children even though her smoking caused them to suffer severe asthma attacks, and both the DHS and the children's doctor had counseled her not to smoke around them.

The mother has not appealed her own loss of parental rights, and the children are currently being cared for by their paternal aunt and uncle. At the time of termination, the children had already been living with foster parents and their paternal aunt and uncle for 18 months and all the trial court knew about respondent's situation was that he would be eligible for parole in 5 months. The trial court obviously did not know that respondent would, in fact, be paroled in 5 months. There was also testimony from the DHS that it would take at least 6 months after parole was granted for respondent to demonstrate that he was capable of caring for the children.[3] So that would have been at least another 11 months of the children living in limbo.[4]

---

[3] Although the majority is critical of me for relying on this testimony, I think that it is a matter of common sense that it would take significant time for an imprisoned father, with respondent's background, who has *never* had the sole responsibility of taking care of young children to demonstrate that he is capable of doing so.

[4] The majority, in my judgment, mischaracterizes the trial court's ruling as an "uninformed presumption of [respondent's] unfitness . . . ." There had been at least nine

The majority concludes that the trial court clearly erred by terminating respondent's parental rights. "'A finding is "clearly erroneous" [if] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made.'" *In re Rood*, 483 Mich 73, 91; 763 NW2d 587 (2009) (opinion by CORRIGAN, J.) (citation omitted). MCL 712A.19b(3)(h) permits termination when

> [t]he parent is imprisoned for such a period that the child will be deprived of a normal home for a period exceeding 2 years, and the parent has not provided for the child's proper care and custody, and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

Those conditions were clearly satisfied here: the children had already been deprived of a normal home for 18 months and, as a result of respondent's incarceration, would have been deprived of a normal home for at least another 11 months. Therefore, respondent's incarceration would have led to the children being deprived of a normal home for well over 2 years.[5] In addition, there was testimony that there was no

_____

proceedings preceding the termination of respondent's parental rights. Respondent was represented by counsel, and the trial court inquired about respondent, at *every single one* of these proceedings. Therefore, if the trial court was "uninformed," this is respondent's own fault. Further, it does not appear that the trial court was "uninformed" about anything because respondent has certainly not done anything to more fully inform *this* Court concerning his ability to properly care for these children. Moreover, the trial court did not "presume[e]" that respondent was an unfit parent. To the contrary, the trial court reached this conclusion only after being involved with this case for more than 2½ years, conducting nine proceedings, listening to the testimonies of the DHS and respondent, and reviewing and applying the pertinent laws.

[5] Although I agree with the majority that MCL 712A.19b(3)(h) does have a "forward-looking" component to it, if the majority interprets this to mean that courts must

5

reasonable expectation that respondent would be able to provide proper care within a reasonable time given the ages of the children.

Respondent had been in prison for more than two years (almost three years by the time he was released), and he had done absolutely nothing to provide for the children's care. They had to be removed from their mother's care because she was unable to properly care for them. They were then placed in foster care until their mother indicated that she would like a relative to care for the children. Some time thereafter, the children were placed with their paternal aunt and uncle. Although respondent's relatives are currently caring for the children, respondent had absolutely nothing to do with this arrangement.[6] As he has been since his youngest was born, he was 'missing in action' in the lives of these children as they were shuttled from one home to another. In addition, there is no evidence that respondent will be able to properly care for these children within a reasonable time. These children are very young, and respondent has been in prison since before the youngest child was even born. The foster care worker testified that it would take at least 6 months after being paroled for respondent to establish that he could properly care for the children; by the time the trial court terminated his parental rights,

_____

ignore the amount of time a respondent has already spent imprisoned, I disagree. Rather, MCL 712A.19b(3)(h) requires us to examine both a respondent's past and future ability to provide proper care and custody of the children, including the amount of time he has already spent imprisoned and the amount of time he will spend imprisoned in the future.

[6] Respondent should be treated no differently from an incarcerated father who has *no* relatives who could provide his children with proper care. Once again, respondent himself did nothing at any juncture to ensure that proper care was provided to these children, despite the fact that he clearly could have.

6

the children had already been living with foster parents and their paternal aunt and uncle for 18 months. These children need stability in their lives and they need it now; they cannot sit around indefinitely and wait to see if respondent, after interminable grants of supposed "due process" nowhere required in the law, can somehow become a responsible parent.[7] For these reasons, I simply cannot conclude that the trial court here clearly erred by terminating respondent's parental rights.

In *Rood*, the lead opinion concluded that the respondent-father's due process rights were violated when his parental rights were terminated even though he had received no notice of the ongoing proceedings. In the instant case, respondent *himself* has not raised any due process issue, and this Court does not normally address issues that were not raised before the lower courts. *Naccarato v Grob*, 384 Mich 248, 255; 180 NW2d 788

---

[7] Even if the DHS had "facilitated respondent's access to services," as the majority contends the DHS should have done, it would still have taken respondent an uncertain amount of time after being paroled to demonstrate that he was capable of staying out of trouble outside of prison and capable of maintaining employment and suitable housing and caring for these children. Furthermore, MCL 712A.19a(6)(c) provides that if the state has not provided adequate services, "[t]he court is *not required to* order the agency to initiate proceedings to terminate parental rights . . . ." (Emphasis added.) Contrary to the majority's contention, the language "not required to" is not synonymous with "shall not." Indeed, given that a lack of adequate services does "not require[]" the court to terminate parental rights, a lack of adequate services also would not "not require" the court to maintain parental rights. The same is true of MCL 712A.19a(6)(a), which provides that the court is "not required to" order the agency to initiate termination proceedings if the children are being cared for by relatives. Finally, in response to the majority's suggestion that respondent may never have received a copy of the parent-agency agreement, I must note that, at the termination hearing, respondent's counsel asked respondent questions pertaining to his compliance with this agreement and respondent answered these questions. Neither respondent nor his counsel said anything that suggested that respondent had not received a copy of the agreement.

7

(1970). However, because the majority gratuitously raises and addresses this issue, I will address it as well. Because respondent was incarcerated, he was not present at all the proceedings, but his *counsel was always present on his behalf.* Respondent's counsel indicated that although he wrote to respondent and notified him of the proceedings and of the fact that respondent could participate by way of speakerphone, respondent did not initially respond. That is, contrary to the majority's repeated contention that respondent was not informed of his right to participate in the hearings by telephone, respondent's attorney *did*, in fact, inform respondent of this right. In addition, when asked whether he had had any contact with respondent, a foster care worker testified, "We send copies of the requirements up and try to make contact with the prison social worker that might be able to help them fulfill some of this and get into the services in the prison." Finally, respondent *did* also, in fact, participate by way of speakerphone during at least two of the proceedings, and he did physically attend the termination hearing. Therefore, unlike the respondent in *Rood*, respondent was notified of the ongoing procedures and was represented by counsel at every one of these proceedings. Thus, contrary to the majority's contention, this case is significantly distinguishable from *Rood*.

That is, unlike the respondent in *Rood*, respondent here was fully afforded due process. Yet the majority does not believe that the due process he received was enough. One can always identify more process that a person can receive under these circumstances or in the criminal justice context. However, all that is required by the law is *due* process-- the process that one is entitled to under the law-- and that is exactly what respondent here received. Respondent received notice of the ongoing proceedings, he

8

received an attorney who represented him at each of the proceedings, and he received an opportunity to participate in each of these proceedings. Given that respondent received *all* the process to which he was entitled under the law, I find no due process violation.[8]

MCR 2.004 provides, in pertinent part:

> (A) This rule applies to
>
> * * *
>
> (2) . . . actions involving . . . the termination of parental rights, in which a party is incarcerated under the jurisdiction of the Department of Corrections.
>
> (B) The party seeking an order regarding a minor child shall
>
> * * *
>
> (3) file with the court the petition or motion seeking an order regarding the minor child, stating that a party is incarcerated and providing the party's prison number and location; the caption of the petition or motion shall state that a telephonic hearing is required by this rule.

---

[8] There is no support in this dissent for the majority's assertion that, because respondent was not an ideal parent, I believe he is "disentitle[d]" to "the rights afforded him as a parent in a proceeding involving his children's welfare." Respondent obviously was entitled to the rights afforded to him under the law, as would be any other person. The majority also asserts that I am improperly taking into consideration respondent's imprisonment. Apart from the fact that the law itself takes into consideration whether "[t]he parent is imprisoned for such a period that the child will be deprived of a normal home for a period exceeding 2 years," MCL 712A.19b(3)(h), it is the *majority* who seems most preoccupied with respondent's incarceration, by excusing and rationalizing conduct that would never be viewed as acceptable in the case of a parent who is not incarcerated. If respondent had not been imprisoned, his disregard for the welfare of his children, his lack of diligence in securing for them a stable home, his toleration of an unacceptable home environment, and his nearly total dereliction of ordinary parental duties would almost certainly be seen as contrary to the best interests of these children and sufficient to justify the trial court's order terminating his parental rights. Although the majority is certainly correct that an imprisoned parent is entitled to equal rights under the law, he is not entitled to special, and more favorable, consideration on account of this status.

9

(C) When all the requirements of subrule (B) have been accomplished to the court's satisfaction, the court shall issue an order requesting the department, or the facility where the party is located if it is not a department facility, to allow that party to participate with the court or its designee by way of a noncollect and unmonitored telephone call in a hearing or conference, including a friend of the court adjudicative hearing or meeting. The order shall include the date and time for the hearing, and the prisoner's name and prison identification number, and shall be served by the court upon the parties and the warden or supervisor of the facility where the incarcerated party resides.

* * *

(E) The purpose of the telephone call described in this rule is to determine

(1) whether the incarcerated party has received adequate notice of the proceedings and has had an opportunity to respond and to participate,

(2) whether counsel is necessary in matters allowing for the appointment of counsel to assure that the incarcerated party's access to the court is protected,

(3) whether the incarcerated party is capable of self-representation, if that is the party's choice,

(4) how the incarcerated party can communicate with the court or the friend of the court during the pendency of the action, and whether the party needs special assistance for such communication, including participation in additional telephone calls, and

(5) the scheduling and nature of future proceedings, to the extent practicable, and the manner in which the incarcerated party may participate.

(F) A court may not grant the relief requested by the moving party concerning the minor child if the incarcerated party has not been offered the opportunity to participate in the proceedings, as described in this rule. This provision shall not apply if the incarcerated party actually does participate in a telephone call, or if the court determines that immediate action is necessary on a temporary basis to protect the minor child.

Not only did respondent not raise the issue of MCR 2.004 below, he did not even raise it

in this Court until after we mentioned the rule in our order directing that oral argument be

10

heard on the application for leave to appeal. *In re Mason*, 485 Mich 993 (2009). There is no question that respondent was served with the petition to terminate his parental rights, and there is equally no question that respondent did participate at least twice by way of a telephone call. Further, MCR 2.004(E) expressly lays out "[t]he purpose of the telephone call," and it appears that each relevant purpose listed was satisfied in this case-- respondent received adequate notice of the proceedings, respondent was represented by counsel, and respondent was informed that he could participate by way of telephone calls in all future hearings.

MCR 2.004(F) further states, "A court may not grant relief requested by the moving party concerning the minor child if the incarcerated party has not been offered the opportunity to participate in the proceedings . . . ." In this case, respondent *was* afforded the opportunity to participate in the proceedings, as shown by his own counsel's statement that counsel had notified respondent that he could participate by way of speakerphone. As a result, the trial court was not precluded from terminating respondent's parental rights. Moreover, MCR 2.004(F) provides that the provision prohibiting the court from granting relief if the incarcerated party was not offered the opportunity to participate "shall not apply if the incarcerated party actually does participate in a telephone call . . . ." Because respondent *did* actually participate in at least two telephone calls and was physically present at the termination hearing, the trial court was not precluded from terminating his parental rights.

For these reasons, I do not believe that the trial court clearly erred by terminating respondent's parental rights, that respondent's due process rights were in any way

11

violated, or that MCR 2.004 prohibited the trial court from terminating respondent's parental rights. Thus, I dissent from this Court's opinion reversing the Court of Appeals' affirmance of the order terminating respondent's parental rights.

Stephen J. Markman
Diane M. Hathaway

12

STATE OF MICHIGAN

SUPREME COURT

In re MASON, Minors.
_____

DEPARTMENT OF HUMAN SERVICES,

       Petitioner-Appellee,

v                                                  No. 139795

RICHARD MASON,

       Respondent-Appellant,
and

CLARISSA SMITH,

       Respondent.

---

WEAVER, J. (*dissenting*).

    I dissent from the majority's reversal of the Court of Appeals' affirmance of the termination of respondent's parental rights. As Justice MARKMAN correctly and clearly states:

        I respectfully dissent from this Court's opinion reversing the Court of Appeals' affirmance of the order terminating respondent-father's parental rights to his two- and four-year-old sons. I simply cannot support the majority's conclusion that the trial court clearly erred by terminating respondent's parental rights. In addition, given that respondent received *all* the process to which he was *entitled* under the law, I find no "due process" violation in the fact that the majority is able to identify ways in which he *could* have been given still more process. The majority, quoting the children's lawyer-guardian ad litem, asserts that respondent was "'hamstrung from the beginning [in] trying to get things in order so that he [could] one day be a father to these children.'" However, the majority disregards two quite significant points. First, to the extent that respondent

was "hamstrung," this was of his own making—nobody but respondent can be blamed for the fact that he was in prison during the pendency of these proceedings. Second, there is no evidence that respondent did *anything* to provide for his children while they were living with their unfit mother, with foster parents, or with their paternal aunt and uncle.[1] Instead, respondent pleaded 'no contest' to the removal petition that alleged that "Mr. Mason has failed to provide for the children physically, emotionally and financially." Indeed, although respondent knew that the children's mother was drinking again even before the court did, he still did nothing to try to protect his children from the precarious situation in which this placed his children. In addition, when he knew that his children were being removed from their mother, he did nothing to prevent them from being placed in foster care even though he had relatives who were willing and able to care for the children.

Despite respondent's repeated failures in these regards, the majority reverses the judgment of the Court of Appeals, which affirmed the trial court's termination of his parental rights, on the basis that the Department of Human Services (DHS) and the trial court did not do enough to help respondent become a better parent. I believe that the majority has it exactly backwards—respondent is the one who did not do enough to become a better parent. He did virtually nothing to demonstrate that he was willing or able to take responsibility for the care and custody of these children. It is potentially catastrophic for these children that their interest in a safe, secure, and stable home must again be placed in abeyance while respondent is afforded yet another opportunity to become a minimally acceptable parent.[2]

---

[1] In response to the majority's assertion that respondent "supported" his family *before* he was imprisoned, I must note that respondent testified that, before he was imprisoned, he and his "family" lived in his mother's house, his girlfriend's grandmother's house, and a house owned by his brother. In light of this testimony, it is not entirely clear who supported respondent and his "family"—respondent or respondent's mother, his girlfriend's grandmother, and his brother. Respondent also has a third child (who was not the subject of the termination proceedings at issue here), and there is no evidence in the record to suggest that respondent has done anything to provide for *this* child either, before or after his imprisonment. Although respondent did at one point write letters to one child while he was in prison, he admitted that he stopped doing even that. To say the least, I do not believe that the trial court clearly erred in its conclusion that the fact

2

that respondent allegedly "arranged for work and housing in anticipation of his parole" was too little, too late.

[2] The majority contends that "there is no reason that the children's lives must be disrupted during the proceedings on remand." Unlike the majority, I believe that not knowing where they may be living *tomorrow* (maybe with their father, maybe with their aunt and uncle, or maybe with new foster parents) very much constitutes a "disruption" in young children's lives.

---

The clear error in this case is not the Court of Appeals' unanimous decision affirming the termination of the imprisoned father's parental rights or the trial court's decision to do so. The clear error is the Supreme Court majority's unrestrained reaching out and the creation of an issue that was not raised in the trial court or the Court of Appeals and that takes 26 pages to find clear error by the trial court where there is none, with the tragic result for these two little boys, two and four years old, who will be deprived of the only parents they have ever known and the security of a stable and loving home that they so need and deserve. Indeed, the majority's decision and opinion clearly and tragically have this case "backwards."

Elizabeth A. Weaver

3