# STATE OF MICHIGAN

# COURT OF APPEALS

In re SESSIONS, Minor.

UNPUBLISHED
March 26, 2015

No. 322460
Livingston Circuit Court
Family Division
LC No. 2014-014713-NA

Before: SHAPIRO, P.J., and GLEICHER and RONAYNE KRAUSE, JJ.

PER CURIAM.

## AFTER REMAND

In this termination-of-parental-rights appeal, we previously affirmed the circuit court's determination that the petitioner established at least one statutory ground in support of termination, but remanded for further consideration of the effect of the child's relative placement on the best-interest analysis. The circuit court conducted an updated hearing and again terminated respondent-mother's parental rights. We affirm that decision.[1]

## I. HEARING ON REMAND

At the continued best-interests hearing, the Child Protective Services (CPS) case worker assigned to JS testified that she spoke with respondent at the hospital the day following JS's birth. At that point, respondent had already been sentenced to a minimum 13-year prison sentence. Respondent told the worker "that she wanted the child to be with her husband's sister and her . . . husband's brother-in-law," HD and RD. The Department of Human Services (DHS) investigated the couple and deemed them an appropriate placement for the child. Accordingly, the state's "goal was that the child would remain permanently with the people chosen by" respondent. The witness testified that the placement was made "[w]ith the hope that" the relatives would allow a flow of information and eventual meeting between parent and child.

---

[1] We also directed the circuit court "to definitively resolve . . . on the record" the issue of the child's Native American heritage. The court indicated that both the Cherokee and Sioux tribes had been notified and neither claimed JS as an Indian Child as required under the Indian Child Welfare Act.

The witness continued that respondent did not agree with this permanency plan. Rather, respondent wanted the paternal aunt and uncle to be given temporary custody without terminating her parental rights so they could bring the child to the prison to visit her. HD and RD were not amenable to respondent's suggested plan. As the child's father had previously kidnapped his older child from a relative placement, HD and RD were only willing to take JS "if they could know that they would be able to care for and protect this child for its entire minority." The relatives also expressed their concern that JS would be left in limbo for 13 years waiting for her mother to take her away from the only home she had ever known.

The paternal aunt and uncle testified at the hearing. HD testified that she had discussed taking custody of JS with both respondent and the child's father. She indicated that she informed respondent that "I didn't know if I would be able to give the child back after" respondent's extended imprisonment. Although respondent and HD did not resolve whether the guardianship would be temporary or permanent, HD told respondent that she preferred permanency. After the child's birth, however, HD and RD definitively decided that they were only willing to take custody if the goal was adoption. HD asserted that she felt it would be against JS's best interests to visit respondent at the prison or to remove the child from her foster parents' care after 13 years. RD reiterated when called to the stand that he was always clear with the caseworker that he only wanted to take custody of JS if the placement was permanent.

Respondent also testified at the hearing. Respondent expressed disagreement with HD's and RD's memory of events. Respondent conceded that the plan was for JS to live with her aunt and uncle until the age of majority. However, respondent asserted that she was to remain the child's mother with the aunt and uncle retaining that status. Adoption would "confuse" these relationships for the child. Accordingly, respondent desired a full legal guardianship instead.

Following the hearing, the referee recommended finding that termination was in the child's best interests. Citing the disagreement regarding the terms of the guardianship, the referee found "[t]here was no custodial agreement which would have provided the child with proper care and custody." Respondent sought to place her child in a temporary situation and the relatives rejected that idea. Accordingly, respondent did not provide proper care and custody through a relative placement as discussed in *In re Mason*, 486 Mich 142; 782 NW2d 747 (2010). The referee noted that the aunt and uncle did not concede to maintaining respondent's parental rights and affirmatively stated their desire to adopt JS. Termination would promote permanence for the child, the referee posited, as it would prevent respondent from trying to regain custody of the child when she is released from prison in 13 years. The referee further emphasized that the child had been with the aunt and uncle since birth and shared a strong bond with her foster family. The circuit court agreed with this assessment, and again terminated respondent's parental rights.

## II. ANALYSIS

As noted in our previous opinion, an incarcerated parent may provide proper care and custody by choosing "who will care for his children while he is imprisoned." *In re Sanders*, 495 Mich 394, 421; 852 NW2d 524 (2014). Such placement is "an explicit factor to consider in determining whether termination was in the child['s] best interests." *Mason*, 486 Mich at 164.

Yet, relative placement does not preclude a determination that termination of parental rights is in the child's best interests. *In re Olive/Metts*, 297 Mich App 35, 43; 823 NW2d 144 (2012).

Had HD and RD accepted respondent's placement without condition, there would be no question that respondent provided proper care and custody for her child. However, the record now clearly establishes that this was not the case. Respondent personally discussed with HD whether HD and RD would be willing to care for the child after her birth. HD agreed, but expressed concerns to respondent about the permanency of the situation. The parties thereafter could not agree to terms and the DHS had to intervene and make the decision to pursue termination despite respondent's involvement in the placement. HD and RD have not changed their position and have only agreed to provide for the child if the goal is adoption. Therefore, relative placement does not weigh against termination in this case.

Other factors also weigh in favor of termination. "[W]hether termination of parental rights is in the best interests of the child must be proven by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). The lower court should weigh all the evidence available to it in determining the child's best interests. *In re Trejo*, 462 Mich 341, 356-357; 612 NW2d 407 (2000). Relevant factors in this consideration include "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *Olive/Metts*, 297 Mich App at 41-42 (citations omitted).

The record evidence reveals that young JS has no bond with respondent, with whom she has never resided. JS shares a strong bond with her foster parents and siblings, however, as she was placed in their home as a newborn. Respondent will be unable to care for the child until she is at least 13 years old. The court sagely found that disrupting JS's home life and placing her with her mother, a virtual stranger, after such an extended separation was not in the child's best interests. Leaving the child without assurance that she would not be removed from her home also did not meet the child's needs. Accordingly, the circuit court properly determined that termination of respondent's parental rights was in JS's best interests.

We affirm.

/s/ Douglas B. Shapiro
/s/ Elizabeth L. Gleicher
/s/ Amy Ronayne Krause