# STATE OF MICHIGAN

# COURT OF APPEALS

UNPUBLISHED
September 13, 2018

*In re* Jones, Minors.

No. 342032
Wayne Circuit Court
Family Division
LC No. 17-000778-NA

Before: SWARTZLE, P.J., and JANSEN and O'BRIEN, JJ.

PER CURIAM.

Respondent appeals as of right the trial court's order terminating his parental rights to his three biological children. We affirm.

## I. BACKGROUND

Respondent is the biological father of three children: a son, DDJ, and two infant twin daughters, DMJ and DHJ. At the time of their removal, the twins were approximately six months old and DDJ was almost two years old. The mother was respondent's live-in partner and the biological mother of all three children. According to her trial testimony, she was also the subject of severe domestic abuse by respondent. Mother testified that respondent was controlling and that she argued often with respondent about the children. These arguments frequently turned physical when respondent would push or choke mother—sometimes until she passed out—and, on at least one occasion, the two parents drew weapons on each other. On New Year's Eve, shortly after the birth of the twins, respondent and mother got into a particularly heated argument regarding the children. The argument turned physical and respondent fled with the children to an abandoned house. Respondent and the children stayed in the house for several hours, after which respondent turned himself into the police. Because of their exposure to the cold, each child was treated for weather-related injuries and the twins developed a respiratory condition that required a weeks-long hospital stay.

Although they separated for a short time following this incident, mother and respondent reconciled and resumed living together shortly thereafter. Mother was the sole provider in the household and would work the midnight shift at a restaurant. When she did so, she left the children in respondent's care. On one night, mother left the children in respondent's care while she was at work. She returned the next morning and went to sleep. When mother woke up, she checked on the children, and found DMJ in dire condition. Mother later reported to the Child Protective Services (CPS) investigator assigned to this case that DMJ's head was swollen and her face was bruised; in mother's words, the child looked "dead."

-1-

According to the CPS investigator, mother questioned respondent about the child's injuries and respondent begged her not to take DMJ to the hospital. Still, mother called a cab and forced respondent to take the child to the hospital. At the hospital, respondent gave two different explanations to medical personnel: respondent told a nurse that the child had fallen out of his arms and hit her head, and respondent told a doctor that the child had fallen out of respondent's bed while he was sleeping. Respondent was arrested at the hospital and taken to the Child Abuse Headquarters for questioning. There, he initially told Detective Ben Biddle that he was holding the child, fell asleep, and she fell off his leg. Upon learning that he was being arrested, however, respondent changed his story and admitted that he had hit the child three or four times in the face because he was frustrated at her crying. At trial, respondent returned to his explanation that the child fell off the bed. When questioned about his wavering explanations, respondent testified that he lied to hospital staff and Detective Biddle to prevent mother from being arrested and CPS from investigating the family's less-than-ideal living situation.

CPS removed the children from mother's care shortly after she arrived at the hospital that night and all three children were given medical evaluations. DMJ's medical exams revealed that the child had a skull fracture and severe bleeding around her brain. Dr. Deniz Altiok testified that the injuries were indicative of abusive trauma and that, as a result of this trauma, at least 50% of the cells in DMJ's brain were irreparably damaged. DMJ's x-rays also indicated a ligament injury in her neck, a healing rib fracture, and a "bucket handle fracture" on her right femur. DHJ's medical exams also revealed bleeding around her brain, for which a shunt was placed to relieve the pressure on her brain. DHJ's x-rays indicated numerous rib fractures at different stages of healing and a bucket-handle fracture on the child's left arm. Dr. Altiok opined that the children's various injuries were caused at different times and were consistent with "abusive trauma." Although respondent testified that DMJ's head injuries were caused when she fell off the bed, he provided no explanation for the other injuries the children suffered. There is no indication that DDJ suffered any injury.

Petitioner sought the termination of both parents' rights to the children in an original petition. The trial court placed the children in the care of petitioner who, in turn, placed the children in a non-relative placement with a friend of the mother. This foster parent indicated that she viewed herself as mother's godmother and that she had known mother for a long time. The children's foster-care worker testified that the children were thriving in their placement and that the foster parent was attentive to the children's special needs and reliably took them to their numerous medical appointments. According to the foster-care worker, the foster parent was interested in adopting all three children. The foster-care worker testified that, although services were offered to mother, there were no services available to respondent due to the criminal charges pending against him.

The termination trial was held over four days. Prior to the end of trial, respondent pleaded guilty to two counts of first-degree child abuse and received ten to thirty years of imprisonment. At the termination trial, respondent testified that he was "railroad[ed]" into accepting the plea deal and was appealing the convictions.

The trial court found that there was clear and convincing evidence to terminate respondent's parental rights under MCL 712A.19b(3)(b)(*i*), (g), (h), (j), and (k)(*iii*) and (v). The trial court then addressed the children's best interests. The trial court noted that respondent's

conviction for first-degree child abuse would remove him from his children's lives for several years, regardless of whether he prevailed on appeal. The trial court found that respondent had caused "very serious injuries" to his children and that respondent could not control his "impulses in such a way that [the people he loves] can be safe around him." The trial court found that the children were "thriving" in their foster home, opined that the children needed permanency, nurturing, and protection, and concluded that "this can best be accomplished through adoption." Thus, the trial court found that the termination of respondent's parental rights was in the best interests of the children.

Respondent now appeals the trial court's termination of his parental rights. The trial court also terminated mother's parental rights, but mother's rights are not at issue in this appeal.

## II. ANALYSIS

*Reasonable Efforts*. Respondent first argues that the trial court erred by terminating his parental rights because petitioner did not provide him with reunification services. We disagree.

"[W]hen a child is removed from the parents' custody, the petitioner is required to make reasonable efforts to rectify the conditions that caused the child's removal by adopting a service plan." *In re Fried*, 266 Mich App 535, 542; 702 NW2d 192 (2005). "However, the petitioner is not required to provide reunification services when termination of parental rights is the agency's goal." *In re Moss*, 301 Mich App 76, 91; 836 NW2d 182 (2013) (cleaned up). Here, petitioner sought termination of respondent's parental rights in its initial petition for removal of the children. Thus, petitioner was not required to provide reunification services to respondent.

*Best Interests*. Respondent does not challenge the statutory grounds underlying the termination of his parental rights. Rather, respondent argues that termination of his parental rights was not in the children's best interests. We review for clear error the trial court's decision regarding the children's best interests. *In re Trejo*, 462 Mich 341, 356–357; 612 NW2d 407 (2000); see also MCR 3.977(K). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App 286, 296–297; 690 NW2d 505 (2004).

Respondent first argues that the trial court erred by failing to consider the children's placement with "fictive kin" in its best-interests analysis. A child's placement with a relative weighs against termination and is a factor that the trial court must consider when making its best-interests determination. *In re Mays*, 490 Mich 997; 807 NW2d 304 (2012); *In re Mason*, 486 Mich 142, 164; 782 NW2d 747 (2010). Yet, the CPS investigator testified that the children were not placed with relatives, but were rather placed with a person who considered herself to be mother's godmother. A godparent is not a "relative" under MCL 712A.19a and, therefore, the trial court did not err when considering the placement.

Next, respondent argues that the trial court erred by failing to consider the interests of the children individually. Respondent is correct that the trial court is required to consider the best interests of each child individually. *In re Olive/Metts Minors*, 297 Mich App 35, 42; 823 NW2d 144 (2012). The trial court, however, is only required to make explicit "factual findings

-3-

concerning each child's best interests" when "the best interests of the individual children *significantly* differ." *In re White*, 303 Mich App 701, 715-716; 846 NW2d 61 (2014). Respondent has not argued that the children's best interests significantly differ. Accordingly, respondent has not shown that the trial court erred by not making explicit factual findings for each child's best interests. *Wilson v Taylor*, 457 Mich 232, 243; 577 NW2d 100 (1998).

Third, respondent argues that the trial court's best-interests analysis was insufficient because the trial court failed to address all of the best-interest factors. While the trial court did not explicitly address all of the factors, many of the factors were rendered irrelevant by respondent's plea and confinement. The trial court properly focused its analysis on the relevant factors—respondent's abuse of the children; the children's need for permanency, stability, and guidance; and the care provided by the children's foster parent. The trial court's findings were succinct and sufficient under the circumstances of this case. See MCR 2.517(2).

Finally, respondent argues that termination was not in the children's best interests because he did not abuse the children, wishes to provide for them, and is attempting to appeal his child-abuse convictions. Respondent's convictions are relevant to the children's safety in his care and there is no authority requiring a trial court deciding a termination case to consider the strength of a respondent's appeal involving his criminal convictions. More importantly, even without considering respondent's convictions, the record indicates that respondent inflicted severe physical abuse on his infant children on multiple occasions. Respondent's abuse escalated to the point where he caused life-threatening injuries to the twins, some of which have caused DMJ permanent brain injury. Respondent has shown that he is a threat to his children's physical and mental well-being. Thus, termination of respondent's parental rights was in his children's best interests.

Affirmed.

/s/ Brock A. Swartzle
/s/ Kathleen Jansen
/s/ Colleen A. O'Brien

-4-