*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* G. M. DIXSON, Minor.

UNPUBLISHED
June 23, 2022

No. 358376
Wayne Circuit Court
Family Division
LC No. 2017-001531-NA

Before: LETICA, P.J., and K. F. KELLY and RIORDAN, JJ.

PER CURIAM.

Respondent appeals as of right the order terminating her parental rights to her minor child, GMD,[1] under MCL 712A.19b(3)(c)(*i*), (g), and (j). We affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

Respondent gave birth to twins on May 11, 2011, and established a guardianship with a relative or family friend[2] to care for these children. Respondent then gave birth to GMD on April 16, 2014, and cared for her for 18 months. In December 2015, respondent felt overwhelmed and left GMD with the Branches, a husband and wife that respondent knew through church. Respondent then became pregnant with twins. Respondent miscarried one of the twins, but gave birth to daughter ABD on February 18, 2017. While in respondent's care, ABD died on March 3, 2017, due to unsafe sleep practices. Children's Protective Services (CPS) conducted an investigation as a result of ABD's death and learned of GMD's informal fictive kin placement with the Branches.

---

[1] GMD's father's parental rights were also terminated, but he is not a party to this appeal.

[2] Initially, in the lower court record, Michelle Henry, the guardian, was referred to as a family friend; however, respondent also identified Henry as "the children's grandmother." At another time, respondent reported that she left the twins in a fictive kin placement with the person who raised her, even though that person was not a biological relative. Thus, the exact relationship of Henry to respondent and her twins was unclear.

Consequently, the Department of Health and Human Services (DHHS) filed a petition on September 5, 2017, and GMD was placed with DHHS. GMD was allowed to remain with the Branches while they undertook the process of becoming a licensed foster care home. The juvenile court assumed jurisdiction following admissions made by respondent on September 22, 2017. In essence, respondent acknowledged her unstable housing, unstable mental health, a domestic violence incident in 2015, and her placement of GMD without granting the caregivers legal authorization. A parent-agency agreement (PAA) was created. During the course of the proceedings, respondent participated in services including medical health evaluations and treatment, domestic violence counseling, parenting classes, and visitation. Respondent received monthly social security benefits purportedly because of hearing loss and her mental health issues. DHHS assisted respondent in acquiring Section 8 housing as well as hearing aids. Respondent's physical examination revealed that she had untreated medical conditions consisting of type-2 diabetes and high blood pressure. Her psychiatric evaluation revealed that she suffered from bipolar disorder, schizophrenia, and anxiety. Respondent, however, did not consistently take the prescribed medications for her mental conditions or wear the hearing aids. According to the caseworkers, it became apparent that although respondent participated in services, she did not appear to benefit and practically apply the lessons learned.

Nonetheless, respondent's supervised visitations with GMD were going well, and DHHS exercised its discretion to allow unsupervised visits with respondent at her home. Respondent took GMD to various places during the unsupervised visitation without obtaining permission. And respondent had individuals who were strangers to GMD present at the home. Finally, DHHS made an unannounced visit to respondent's home and found respondent asleep in her car while GMD was playing outside without any monitoring. In light of these incidents, supervised visitation at the DHHS office was reinstated.

On September 12, 2019, respondent attended a visitation with GMD at the DHHS office. Respondent, who was pregnant, got into an argument over the use of the car with her boyfriend, Matthew Jordan (Jordan), the father of her then unborn child. Respondent told a DHHS caseworker that Jordan was being violent and would not return her car keys. Respondent also advised that Jordan had been violent the prior week at their home, and the police had to be called. The caseworker retrieved the car keys from Jordan and reported that he was acting erratic, yelled obscenities and threats, and refused to leave. The police had to be called, and Jordan was banned from the DHHS premises. GMD shared with her therapist and caseworker that she was afraid of Jordan because of the domestic violence she witnessed.

Respondent gave birth to MJJ in Macomb County on October 31, 2019. MJJ was removed from respondent and Jordan's care in early November 2019. Because of his birthplace and respondent's residence, a CPS investigation commenced in Macomb County.

At the end of 2019, the trial court instructed DHHS to file a supplemental petition seeking permanent custody of GMD. The trial court agreed to bifurcate the permanent custody and best interest hearings. Two hearings were held in early 2020 before the courts were closed because of the pandemic. The caseworker testified that respondent and GMD came to the agency's attention because of the asphyxia death of ABD resulting from respondent's unsafe sleep practice. The PAA was created on November 27, 2017. This agreement required respondent to complete parenting classes, complete individual and family therapy, domestic violence and anger

-2-

management, participate in a clinic for child study, and undergo psychiatric and psychological evaluations and take prescribed mental health medications. Further, respondent was to obtain suitable housing and a legal source of income, maintain regular contact with DHHS, visit GMD, and attend court hearings.

Although respondent completed parenting and domestic violence classes, the caseworker opined that respondent did not benefit from those classes because she struggled to make proper, consistent parenting choices during the weekly scheduled visitation. Initially, respondent's supervised visits went "really well," and she transitioned to unsupervised visits. However, the caseworker cited the reports of domestic violence between respondent and Jordan as well as the incident in which respondent fell asleep in the car, leaving GMD unattended. Respondent did not heed the advice to end the relationship with Jordan. Further, the caseworker opined that respondent did not benefit from the mental health services. Although psychological and psychiatric evaluations were completed, respondent continued to struggle with understanding the importance of maintaining healthy relationships for herself and GMD. Respondent was diagnosed with depression, bipolar disorder, schizophrenia, and anxiety, but did not consistently take her prescribed mental health medications. The caseworker acknowledged that respondent secured Section 8 housing, but there was evidence that respondent allowed her sister and Jordan to stay there contrary to the program's rules. The caseworker acknowledged that respondent had monthly income through social security benefits.

Respondent testified that she was in compliance with her PAA and had benefited from services. In parenting classes, respondent learned how to properly nurture and care for her children physically, mentally, and emotionally. Respondent disagreed with the testimony that she had not learned anything from her domestic violence counseling. Rather, if she encountered Jordan and he tried to cause problems, respondent would call the police. Respondent lived in a two-bedroom home for five months that was deemed suitable for GMD. She obtained the housing through a Section 8 voucher, and her monthly social security benefits for her hearing loss covered her other expenses. Respondent also cited her completion of individual and family therapy, and the therapy allowed her to understand GMD's feelings and emotions. Respondent attended her weekly visitation with GMD. Respondent denied that she was currently prescribed medications for mental health conditions, but would take them if prescribed. Respondent also denied that domestic violence was involved in her relationship with Jordan. She testified that their relationship had ended and their only contact involved the co-parenting of MJJ. Respondent admitted that she obtained a personal protection order (PPO) against Jordan, but claimed that she did not fear Jordan. Rather, the PPO was obtained at the behest of the caseworker who threatened to terminate respondent's parental rights unless respondent complied. Respondent denied the caseworker's testimony that reflected negatively on her such as the September 2019 domestic incident at the DHHS office, the visit in which respondent was found asleep in the car, the continuation of a relationship with Jordan, and the occupants of her Section 8 housing.

On May 10, 2021, the permanent custody hearing continued because the court had reopened. Respondent's counsel asked that the case be dismissed, contending that the petition was stale because of delay. The trial court agreed with the request by DHHS and the guardian ad litem to update the proofs in lieu of dismissal.

Respondent testified that her rights to MJJ in the Macomb County case were not terminated, she had supervised visitation with him, and she was no longer in a relationship with Jordan; they merely co-parented MJJ together. Respondent had visitation with GMD twice a week at the local mall. Respondent did not feel comfortable with the Branches[3] so the visits were supervised by a parenting coach, and respondent had only missed one visit due to pneumonia. Respondent took blood pressure medication and participated in therapy for her mental health. She also maintained her Section 8 housing. And, in addition to her social security benefits, respondent earned income by working 16 hours per week as an aide at a senior living facility. If there were warrants pending for her arrest, respondent believed they only pertained to traffic offenses. Although respondent currently had a suspended license, she had a car and drove to work. Respondent testified that she would not drive with children in her car and reported that a friend had driven her to the court hearing. Respondent further denied that she ever grabbed the steering wheel of her car as her father drove it. Respondent did not want her parental rights terminated and would take mental health medications to continue the relationship with GMD.

The caseworker testified that respondent was doing well in her visits with GMD, but the visitation supervisor indicated that respondent could get "lazy" during the visits and he would have to motivate her and also provide redirection or education. Respondent recently sought to renew her Section 8 housing, continued to see her mental health counselor, and continued to work. Despite positive action including housing, disability benefits, and a job, the caseworker testified that respondent needed help with daily living and parenting was overwhelming particularly when she had supervised visits with both GMD and MJJ.

Nonetheless, the caseworker did not recommend additional time for respondent to make progress on her PAA. The case had been pending for three years, and GMD had been placed with the Branches for nearly six years. GMD was starting to deteriorate, show signs of trauma, and change her behavior; she was scared and anxious. GMD feared being removed from the Branches and referred to them as "mom and dad." GMD began to act out before the visits with respondent, insulted the respondent's hygiene, and was torn because she did not want to upset respondent or the Branches.

Additionally, the caseworker was concerned about respondent's mental health. Respondent's father, Kenneth Ray, called the caseworker to report that respondent stopped taking her mental health medication and stopped cleaning her home, so he cleaned it. Respondent began to hang out with a motorcycle club and stopped bathing. She became erratic. In October 2020, Ray was driving with respondent as a passenger when she became irate and grabbed the steering wheel nearly causing an accident. Respondent insisted that Ray get out of the car, and she drove off without him.

The caseworker opined that GMD would be traumatized by a return to respondent's care. GMD's therapist mirrored the concerns of the caseworker, noting that GMD was placed with the

---

[3] Although initially respondent and the Branches worked well together, things had changed. Respondent's father, Kenneth Ray, contacted DHHS to report that respondent prompted her friend to call in a fabricated CPS complaint against the Branches in August 2020. The complaint at respondent's behest was investigated, not substantiated, and closed.

Branches at a stage of development where she formed attachments and looked to the Branches for security, comfort, and emotional support. GMD became anxious and nervous before court hearings and feared leaving the home and bond she had built for the last six years. GMD preferred to remain with the Branches, but still visit with respondent and her siblings. The caseworker opined that respondent could not raise GMD alone and indicated that respondent herself needed assistance or a guardian. Respondent's mental health caused her to go in and out of periods of depression. As an adult, respondent needed to address her hygiene, blood pressure, hearing, weight, dental, and sleep apnea issues. The addition of attending to the needs of children, their schooling, and their medical appointments would be "a lot." Thus, the barriers to reunification continued.

The trial court found that the statutory grounds for termination, MCL 712A.19b(3)(c)(*i*), (g), and (j), were established. And, after considering additional testimony, the trial court determined that termination of respondent's parental rights was in GMD's best interest. Respondent appeals.

## II. STATUTORY GROUNDS

Respondent alleges that DHHS failed to present clear and convincing evidence to support the statutory grounds for termination of her parental rights. We disagree.

To terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination expressed in MCL 712A.19b(3) has been established. *In re Mota*, 334 Mich App 300, 320; 964 NW2d 881 (2020) (citation omitted). A challenge to the trial court's finding that a statutory ground for termination was established is reviewed for clear error. *Id*. A finding is clearly erroneous when there is some evidence to support it, but a review of the entire record, leaves the reviewing court with the definite and firm conviction that the trial court made a mistake. *Id*.

The specific statutory grounds for termination of MCL 712A.19b relied on by the trial court provide:

(3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:

* * *

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

* * *

(g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

* * *

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

Generally, the state may not fail to evaluate or involve a respondent, but then terminate her rights premised on her failure to comply with the case service plan at that time or in the future. *In re Mason*, 486 Mich 142, 159-160; 782 NW2d 747 (2010). "Only one statutory ground need be established by clear and convincing evidence to terminate a respondent's parental rights, even if the court erroneously found sufficient evidence under other statutory grounds." *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011). Regard is given to the trial court's special opportunity to determine the credibility of the witnesses who appeared before it. *Id*. at 33. We conclude that there was clear and convincing evidence to support MCL 712A.19b(3)(c)(*i*), and the trial court did not clearly err in its determination. *In re Mota*, 334 Mich App at 320.

Contrary to respondent's assertion, the conditions that led to the adjudication continued to exist and there was no reasonable likelihood that the conditions would be rectified within a reasonable time when considering GMD's age. MCL 712A.19b(3)(c)(*i*). GMD was 18 months old when respondent informally placed GMD with the Branches. The Branches were not given a formal guardianship. Rather, it was proffered by respondent that the placement was temporary until she could obtain stable and suitable housing. But respondent alleged that she was unable to retrieve GMD because she became pregnant again. Shortly after respondent gave birth to ABD, ABD died of asphyxia due to unsafe sleep practices. This death caused a CPS investigation and for DHHS to learn of GMD's informal placement with the Branches.

After respondent made admissions to unstable housing, unstable mental health, and domestic violence, the court assumed jurisdiction over GMD, and a formal PAA was prepared. Respondent was required to address mental health issues, parenting, domestic violence, visitation, legal source of income, and housing. Although respondent completed many of the components of the PAA, there was no indication that respondent benefited from the services. When respondent had physical contact with GMD, she conducted a strip search of the child to search for bruises and markings. The caseworker and therapist had to apprise respondent of the physical intrusion that involved and other means of inquiry, such as communication, to achieve the same goal.

According to the caseworkers and respondent's father, respondent did not consistently take her medication, did not timely appear for visits, and did not address her improper relationships. During her most recent visitation, the supervisor opined that respondent still needed direction, got "lazy," and had to be motivated by him. When the visits were briefly transferred to unsupervised, an unannounced visit found respondent asleep in her car as GMD was not monitored. Although GMD expressed fear of Jordan, respondent continued her relationship with him. When respondent was presented with facts that were unfavorable, she simply denied their occurrence. Thus,

respondent denied that GMD was present as she slept in the car, denied that she grabbed the steering wheel as her father drove, and denied that a Macomb County CPS investigator found Jordan asleep in respondent's home after their child MJJ had been removed from their care. Indeed, respondent denied driving to court on a suspended license despite two witnesses observing her driving that morning.

Respondent's psychological evaluation revealed that she was one of 13 children, and she grew up in foster care because the rights of her parents were terminated. Respondent indicated that she was physically abused by her foster mother. Thus, it did not appear that respondent had a personal foundation to apply to her own parenting, and she did not incorporate the training received in the services to the parenting of GMD. Accordingly, respondent resorted to strip searches of GMD for signs of abuse, but did not discuss inappropriate touching with the child. Respondent further acknowledged that she had mental health and hearing issues. Nevertheless, she failed to consistently take her medication or wear her hearing aids.

Respondent had a history of giving birth to children and relying on others to raise them when she could not cope. Respondent authorized the guardianship of her older twins to Henry, terminated the guardianship, but had to agree to its reinstatement because of CPS involvement. When respondent did not have housing, she placed GMD with the Branches when the child was only 18 months old. The Branches, respondent's fellow church members, were not given formal authorization to obtain benefits or seek treatment for the child. Although it was proffered that formality was not required because the arrangement was only temporary, respondent became pregnant again. That child died in respondent's care because respondent engaged in unsafe sleep practices. And during a brief period of unsupervised visitation as to GMD, respondent left her unmonitored while she slept in a car because she was tired. The record reflects that the mental health services and the parenting and domestic violence classes that respondent received did not rectify the conditions that caused GMD to come into care. Respondent did not appear to be interested in consistently taking medication to control her mental health issues. Her erratic behaviors, periods of depression, and questionable relationships failed to provide any assurance that the adjudicative conditions were rectified such that GMD could properly be cared for by respondent. Respondent completed the housing and legal source of income requirements of the PAA but it was not reasonably likely that the remaining components would be completed within a reasonable time given GMD's age. In light of the facts and circumstances, the trial court did not clearly err in determining that MCL 712A.19b(3)(c)(*i*) was established by clear and convincing evidence.[4]

---

[4] Although only one statutory ground for termination of parental rights is necessary, the trial court also did not clearly err in concluding that MCL 712A.19b(3)(g) and (j) were satisfied by clear and convincing evidence for these same reasons.

### III. BEST INTERESTS

Respondent contends that termination of her parental rights was not in GMD's best interests. We disagree.

Once a statutory ground for termination has been established, the trial court must conclude that termination of parental rights is in the child's best interests before it can terminate parental rights. MCL 712A.19b(5); *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012). A trial court's decision regarding a child's best interests is also reviewed for clear error. *In re Laster*, 303 Mich App 485, 496; 845 NW2d 540 (2013). When making the best interests determination, the trial court may consider the entire record. *In re Pederson*, 331 Mich App 445, 476; 951 NW2d 704 (2020).

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). "In deciding whether termination is in the child's best interests, the court may consider the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts*, 297 Mich App at 41-42 (citations omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014). A child's placement with relatives is also a factor to consider and generally weighs against termination. *In re Gonzales/Martinez*, 310 Mich App 426, 434; 871 NW2d 868 (2015).

The trial court did not clearly err in concluding that termination of respondent's parental rights was in GMD's best interests. Respondent was never able to plan for the child or demonstrate appropriate parenting skills in an unsupervised setting. To respondent's credit, she obtained housing, had a legal source of income through social security benefits, and she obtained additional employment as an aide in a senior living facility. However, respondent failed to demonstrate that she could parent children. Of her four children, ABD died within weeks of birth because of unsafe sleep practices. Respondent gave Henry guardianship over her twins and informally turned GMD over to the Branches. Respondent failed to demonstrate that she was interested in long-term parenting of GMD by consistently taking her medication to maintain her mental health. Respondent's father testified that respondent could not manage her mood or emotions and maintain a clean home when she failed to take her medication. Additionally, respondent engaged in poor decision-making. She continued to associate with Jordan despite GMD's fear of him. She failed to address outstanding misdemeanor traffic warrants and drove on a suspended license. The recent parenting time supervisor noted that respondent lacked motivation and got lazy with her parenting. Under the circumstances, it is questionable whether respondent could manage GMD's needs. In light of the record, we cannot conclude that the trial court clearly erred in its determination that

termination of respondent's parental rights was in GMD's best interests. *In re Laster*, 303 Mich App at 496.[5]

      Affirmed.

/s/ Anica Letica
/s/ Kirsten Frank Kelly
/s/ Michael J. Riordan

---

[5] In a single sentence, respondent alleged that a guardianship should have been contemplated in lieu of termination. Although it is true that an alternative, such as placement with relatives, may weigh against termination, *In re Gonzales/Martinez*, 310 Mich App 434, this request was not made in the trial court. Indeed, it appears that no request was made because the relationship between respondent and the Branches had soured. Given respondent's actions in searching for signs of physical abuse by the Branches and the purportedly false report against them, guardianship with the Branches in lieu of termination of parental rights was never contemplated.