*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* CARTER/MARTIN/WALLER/HUNT, Minors.

UNPUBLISHED
March 20, 2026
10:01 AM

No. 373677
Wayne Circuit Court
Family Division
LC No. 2019-001516-NA

*In re* CARTER/MARTIN, Minors.

No. 373679
Wayne Circuit Court
Family Division
LC No. 2019-001516-NA

*In re* D M HUNT, Minor.

No. 373708
Wayne Circuit Court
Family Division
LC No. 2019-001516-NA

Before: BORRELLO, P.J., and MARIANI and TREBILCOCK, JJ.

PER CURIAM.

In Docket No. 373677, respondent-mother appeals by right the trial court's orders terminating her parental rights to her seven minor children, JM1, JM2, JC, JW1, JW2, JW3, and DH. In Docket No. 373679, respondent-father Martin appeals by right the trial court's order terminating his parental rights to his three minor children, JM1, JM2, and JC (collectively, "the Carter/Martin children"). In Docket No. 373708, respondent-father Hunt appeals by right the trial

-1-

court's order terminating his parental rights to his minor child, DH.[1]  All three respondents' parental rights were terminated pursuant to MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), (c)(*ii*) (failure to rectify other conditions), (g) (failure to provide proper care and custody), and (j) (reasonable likelihood of harm if returned to parent).[2]  We affirm.

## I. BACKGROUND

Respondent-mother and respondent-father Martin have an extensive history with Children's Protective Services (CPS) dating back to October 2014, but the trial court did not become involved with this family until August 2019, when the Department of Health and Human Services (DHHS) filed its first petition against these respondents, alleging substance abuse, inadequate housing, physical neglect, improper supervision, and domestic violence.  The trial court eventually assumed jurisdiction over the children[3] and placed them in protective custody while respondents engaged in services to address these issues, which were provided by DHHS as part of a case service plan.  In January 2021, after having determined that respondents successfully complied with the services offered to them, the court terminated its jurisdiction over the children and returned them to respondent-mother's and respondent-father Martin's care.

In May 2022, the trial court, pursuant to the emergency-removal request of DHHS, issued an ex-parte order temporarily removing the children from respondent-mother's and respondent-father Martin's care.[4]  DHHS thereafter filed a petition requesting that the court take jurisdiction over the children, order that they remain placed out of respondents' care, and terminate respondent-mother's and respondent-father Martin's parental rights at initial disposition.  DHHS alleged that, despite having completed services in accordance with their prior case service plans and regaining custody of the children, respondent-mother and respondent-father Martin had again exposed the children to deplorable housing conditions, neglected them, and failed to properly supervise them.  Following a preliminary hearing, the court authorized the petition and ordered supervised parenting time to occur under certain conditions.

In August 2022, the trial court held a two-day bench trial to determine whether there was a sufficient basis to assume jurisdiction and for the statutory grounds for termination alleged in

---

[1] We consolidated these appeals "to advance the efficient administration of the appellate process." *In re Carter/Martin/Waller/Hunt Minors*, unpublished order of the Court of Appeals, entered December 18, 2024 (Docket Nos. 373677; 373679; 373708).

[2] The father of JW1, JW2, and JW3 was also a respondent in the proceedings below and his parental rights were terminated under the same statutory grounds, but he is not involved in this appeal.

[3] The court assumed jurisdiction over JM1, JM2, and JC pursuant to the petition, and it assumed jurisdiction over the triplets—JW1, JW2, and JW3—shortly after they were born in April 2020. DH was not subject to the court's jurisdiction at this time, as she was not born until October 2022.

[4] The Carter/Martin children were initially placed with their paternal uncle but were later moved to separate nonrelative placements, and the triplets were placed in a nonrelative foster home (where they remained throughout the proceedings), as no suitable relative placement was available.  As noted, DH was not born until October 2022 and therefore was not subject to this removal request.

DHHS's petition. At the conclusion of the trial, the court found that statutory grounds for jurisdiction had been established by more than a preponderance of the evidence, but that the cited statutory grounds for termination had not been established by clear and convincing evidence, and so the court ordered that reasonable efforts toward reunification be made. DHHS thereafter provided respondent-mother and respondent-father Martin with case service plans to address their poor parenting skills, substance-abuse issues, mental-health concerns, domestic-violence issues, and inadequate housing, which the court ordered that they comply with and benefit from.

In October 2022, respondent-mother gave birth to DH, who was immediately taken into protective custody.[5] DHHS then filed another petition naming respondent-mother and DH's father, respondent-father Hunt, as respondents and requesting that the trial court take jurisdiction over DH as well. Following respondent-mother's plea in February 2023 and an adjudication bench trial concerning respondent-father Hunt in April 2023, the trial court assumed jurisdiction over DH. Respondent-mother was ordered to comply with her existing case service plan, and respondent-father Hunt was ordered to comply with and benefit from a case service plan provided by DHHS to address his domestic-violence issues, mental-health concerns, poor parenting skills, and inadequate housing.

Throughout the proceedings, all three respondents struggled to demonstrate any progress on their respective case service plans, and in November 2023, DHHS filed a supplemental petition requesting termination of respondents' parental rights.[6] Following a seven-day termination hearing,[7] the trial court found that clear and convincing evidence established grounds for termination of respondents' parental rights and that a preponderance of the evidence established that termination was in the children's best interests. The trial court thereafter issued an order terminating respondents' parental rights as previously described. These appeals followed.[8]

## II. REASONABLE EFFORTS

On appeal, respondent-father Martin argues that DHHS did not make reasonable efforts toward reunification. "[W]e review for clear error the trial court's factual finding that [DHHS]

---

[5] DH was placed in the same nonrelative foster home as JM2, where she remained throughout the proceedings, as there was no suitable relative placement available for her.

[6] DHHS initially filed its supplemental petition in August 2023, but it only listed respondent-father Hunt as DH's putative father. Respondent-father Hunt was subsequently established as DH's legal father, and DHHS thereafter filed its amended petition in November 2023.

[7] The termination hearing began in January 2024 and concluded in November 2024.

[8] We note here, as we have elsewhere, that DHHS filed its appellate brief in this matter after the case had been submitted to this panel following oral argument—well past the brief's due date, and without any extension formally requested from or granted by this Court. See *In re Owens Minors*, unpublished per curiam opinion of the Court of Appeals, issued February 18, 2026 (Docket Nos. 375167; 375168); *In re Grace Minors*, unpublished per curiam opinion of the Court of Appeals, issued March 6, 2026 (Docket No. 369630). We repeat our admonition from *Owens* and *Grace* regarding the importance of and need for timely filed briefs.

made reasonable efforts to reunify [a] respondent[] with the child." *In re Atchley*, 341 Mich App 332, 338; 990 NW2d 685 (2022). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013) (quotation marks and citation omitted).

In general, when a child is removed from a parent's custody, DHHS must make reasonable efforts toward reunification, except under certain, limited circumstances. *In re Walters*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 369318); slip op at 3-4; see also MCL 712A.19a(2). Reasonable efforts include "creat[ing] a service plan outlining the steps that both [DHHS] and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *In re Matamoros*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 371544); slip op at 4 (quotation marks and citation omitted). DHHS and the trial court must then continually review, update, and revise a parent's case service plan as needed throughout the proceedings to ensure that a parent has "a meaningful opportunity to comply with a case service plan[.]" *In re Mason*, 486 Mich 142, 156, 169; 782 NW2d 747 (2010). Correspondingly, alongside DHHS's "responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *Atchley*, 341 Mich App at 339 (quotation marks and citation omitted). "This means a respondent-parent must both participate in services and demonstrate that they sufficiently benefited from the services provided." *Id*. (quotation marks and citation omitted).

In making his reasonable-efforts argument, respondent-father Martin argues that DHHS failed to provide "[t]he basic services" necessary to facilitate parenting time after it was determined that JM1, JM2, and JC experienced trauma and refused to attend parenting time. We disagree, as the record before us clearly reflects otherwise.

Early on in the proceedings, JM1, JM2, and JC disclosed that they were subjected to physical abuse, sexual abuse, and neglect while in respondent-mother's and respondent-father Martin's care. They also disclosed that respondent-father Martin was either the perpetrator of that abuse or had failed to protect them from that abuse by others. The children were thereafter provided with extensive mental health services, including trauma assessments, psychiatric services, and trauma therapy. These assessments and services revealed that all three children had significant trauma from their time in respondent-mother's and respondent-father Martin's care. Additionally, throughout the proceedings, the children continually exhibited negative reactions and emotional distress during or around parenting times with their father, and they repeatedly reported that they did not want to attend parenting time with him. As the proceedings progressed, the children eventually refused to attend any parenting times with respondent-mother and respondent-father Martin.

In light of all this, in June 2023, the trial court ordered that parenting times could only occur in a therapeutic setting, and the caseworker then immediately made referrals to a supportive visitation service so that such parenting times could occur. Respondent-father Martin, however, did not attend several scheduled intake appointments to initiate those services and was eventually dismissed from them as a result, thereby failing to uphold his "commensurate responsibility" to engage in and benefit from the services offered by DHHS. *Atchley*, 341 Mich App at 339 (quotation marks and citation omitted). The caseworker testified that she re-referred respondent-

father Martin to the services in August 2023, and again in October 2023, but the referrals were denied both times because of his previous failure to engage in or comply with the services. Despite this, the caseworker continued to re-refer respondent-father Martin to the services so that parenting times in a therapeutic setting could occur. The referral was eventually accepted in April 2024, and respondent-father Martin completed the intake appointment in June 2024. Even by then, however, the children were still refusing to attend parenting times, and their therapists reported that forcing them to attend parenting times, even in a therapeutic setting, would be detrimental to the children's mental health and well-being because of their "past trauma" and the "terrors being brought out" because of it. Based on this recommendation, DHHS did not force the children to attend parenting times, but it continued to provide mental-health services to the children—and to respondent-father Martin, who, as discussed more thoroughly below, largely failed to participate in or benefit from those services—in hopes of alleviating the barriers to parenting times.

On this record, it is clear that DHHS continually reviewed, updated, and revised respondent-father Martin's case service plan and made referrals to the necessary services to ensure that respondent-father Martin had a meaningful opportunity to participate in parenting time with his children. See *Mason*, 486 Mich at 156, 169; *Matamoros*, ___ Mich App at ___; slip op at 4. Respondent-father Martin acknowledges on appeal that his children had experienced trauma and refused to attend parenting time as a result of that trauma, but he asserts that DHHS nonetheless "ha[d] the responsibility to facilitate" parenting time because he wanted to attend it with his children. But respondent-father Martin does not explain how, considering everything discussed above, DHHS did not make reasonable efforts to facilitate parenting time, or what more DHHS could have reasonably done in that regard. And indeed, the children's therapists made clear that forcing the children to attend parenting time would have been detrimental to their mental health and well-being. Accordingly, the trial court did not reversibly err when it determined that DHHS made reasonable efforts toward reunification. See *Atchley*, 341 Mich App at 338-339.

### III. TERMINATION OF RESPONDENTS' PARENTAL RIGHTS

Both respondent-fathers also challenge the trial court's findings regarding the cited statutory grounds for termination of their parental rights. Additionally, all three respondents challenge the trial court's finding that termination was in the children's best interests.

### A. STANDARDS OF REVIEW

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). "We review for clear error both the trial court's decision that a statutory ground for termination has been established and the court's decision regarding the child's best interests." *In re Simpson*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 368248); slip op at 3. Statutory grounds for termination must be found by clear and convincing evidence, and termination must be found to be in the child's best interests by a preponderance of the evidence. *Id*. at ___; slip op at 3. As noted, we give deference "to the special ability of the trial court to judge the credibility of witnesses." *In re Pederson*, 331 Mich App 445, 472; 951 NW2d 704 (2020) (quotation marks and citation omitted).

## B. STATUTORY GROUNDS FOR TERMINATION

Both respondent-fathers argue that the trial court clearly erred by finding that clear and convincing evidence supported termination of their parental rights under the cited statutory provisions. We disagree.

One statutory ground for termination cited by the trial court in this case was MCL 712A.19b(3)(c)(*i*). A court may terminate parental rights under MCL 712A.19b(3)(c)(*i*) if it finds by clear and convincing evidence that "after 182 days have elapsed, the conditions resulting in adjudication remain present and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." *In re MJC*, 349 Mich App 42, 51; 27 NW3d 122 (2023) (quotation marks and citation omitted). What constitutes a "reasonable time" requires consideration of how long the parent will take to improve the conditions and how long the child can wait for the improvements to occur. See *In re Dahms*, 187 Mich App 644, 648; 468 NW2d 315 (1991). "Even if conditions improved in the months before the termination hearing, a trial court may look to the totality of the evidence to determine whether a parent accomplished meaningful change in the conditions that led to adjudication." *In re Jackisch/Stamm-Jackisch*, 340 Mich App 326, 334; 985 NW2d 912 (2022).

In this case, there is no question that more than 182 days elapsed between the issuance of the initial dispositional orders—in August 2022 as to respondent-father Martin and in April 2023 as to respondent-father Hunt—and the issuance of the termination order in November 2024. Regarding respondent-father Martin, the conditions that led to adjudication were improper supervision, neglect, and inadequate housing. Regarding respondent-father Hunt, the conditions that led to adjudication were domestic-violence issues, mental-health concerns, inadequate housing, and concerns regarding his parenting ability. Based on the totality of the evidence before the trial court at the time of termination, we see no reversible error in the court's conclusion that these conditions continued to exist and that there was no reasonable likelihood that the conditions would be rectified within a reasonable time considering the children's ages.

Regarding respondent-father Martin, the record evidence supported the trial court's finding that he had failed to adequately address any of his barriers to reunification. There was ample testimony throughout the proceedings that the home shared by respondent-mother and respondent-father Martin was in deplorable condition. According to individuals who assessed the home, it had broken windows, exposed wires, and an exterior door hanging off its hinges, as well as filthy floors, trash strewn about every room, and a very strong, foul odor. The home also had no running water or electricity, did not have enough beds for the children, and the beds that were available to the children were soiled. Although respondent-father Martin moved into a different three-bedroom home by the time of the termination hearing, the caseworker determined that it too was inadequate, as it did not have a functional kitchen or enough beds for the children.

The caseworker also testified that she had repeatedly referred respondent-father Martin to mental-health, domestic-violence, and parenting-education services throughout the proceedings, none of which he consistently participated in or demonstrated any benefit from. Respondent-father Martin missed his scheduled appointment for his psychological evaluation on five separate occasions and he ultimately did not complete the evaluation until April 2024, after the multi-day

termination hearing had already begun. He also had to be referred to individual therapy four times throughout the proceedings because he had missed too many scheduled appointments, and the caseworker testified that even during the periods that he did consistently attend appointments, she did not believe that he had benefitted from them because his behavior never changed. The caseworker further testified that she had to refer respondent-father Martin to domestic-violence services several times because he missed too many appointments and kept getting dismissed from the program, and even during the periods when he was more consistent with those services, his therapist reported that she saw no benefit from his participation, as he and respondent-mother continued to engage in domestic disputes throughout the proceedings. Respondent-father Martin also minimally participated in various parenting-education and parenting-support services, which resulted in his dismissal from those programs.

Regarding respondent-father Hunt, the record evidence similarly supported the trial court's finding that he had failed to adequately address any of his barriers to reunification. The caseworker testified that by the time of the termination hearing, she was unable to determine whether he had obtained adequate housing because he repeatedly refused to provide her with an address, and so she was never able to assess the home. The caseworker also testified that respondent-father Hunt completed his psychological evaluation in September 2023, but he failed to follow through with any of the services recommended by that evaluation. Specifically, he was repeatedly dismissed from the recommended individual therapy for consistently failing to attend scheduled appointments and to maintain contact with his therapist. The caseworker also referred respondent-father Hunt to domestic-violence services at least four times, and although he would initially participate in the service after each referral, he would stop attending after a few sessions; he ultimately never completed any of the domestic-violence services that he was referred to. Respondent-father Hunt also consistently failed to participate in parenting-education and parenting-support services, despite several referrals, and he eventually began refusing to participate in the services because he did not believe that he needed them. Additionally, he only attended 19 supervised parenting times with DH over a 15-month period, and during the parenting times he did attend, DH was visibly uncomfortable and constantly trying to leave the room.

The record evidence also supported the trial court's finding that there was no reasonable likelihood that either respondent-father would rectify these conditions within a reasonable time considering the children's ages. See MCL 712A.19b(3)(c)(*i*). As previously indicated, neither respondent-father meaningfully participated in or demonstrated any benefit from the services offered to address the issues that brought the children into care during the pendency of this case— a 27-month period for respondent-father Martin and a 17-month period for respondent-father Hunt. Neither respondent-father's housing was deemed appropriate for their children, and there was no evidence suggesting that that would change anytime soon. Additionally, neither respondent-father consistently participated in, let alone completed, the individual therapy, domestic-violence services, or parenting-education services provided to them. Both respondent-fathers required multiple referrals for each service and would simply stop participating in the services shortly after each new referral, and there was no evidence indicating that either of them would change this pattern and instead meaningfully participate in those services anytime soon.

In sum, the totality of the record before the trial court supported its conclusion that clear and convincing evidence demonstrated that neither respondent-father Martin nor respondent-father Hunt had "accomplished meaningful change in the conditions that led to adjudication" and that

-7-

there was no reasonable likelihood that either of them would rectify those conditions within a reasonable time given the children's ages. See *Jackisch/Stamm-Jackisch*, 340 Mich App at 334; MCL 712A.19b(3)(c)(*i*). Both respondent-fathers have failed to show that the trial court reversibly erred in reaching this conclusion.[9]

## C. BEST INTERESTS

As noted, all three respondents argue the trial court erred by finding that termination of their parental rights was in the children's best interests. We disagree. Based on the record before us, we see no reversible error in the trial court's best-interests determination as to each respondent.

When determining whether termination is in a child's best interests, the court should place its "focus on the child rather than the parent." *In re Mota*, 334 Mich App 300, 321; 964 NW2d 881 (2020). "The trial court should weigh all the evidence available to determine the child's best interests," and it should consider a variety of factors, including "the child's bond to the parent; the parent's parenting ability; the child's need for permanency, stability, and finality; and the advantages of a foster home over the parent's home." *Simpson*, ___ Mich App at ___; slip op at 5 (cleaned up). "Other factors that the court may consider include the parent's history, the parent's psychological evaluation, the age of the child, and a parent's substance-abuse history." *MJC*, 349 Mich App at 62 (citations omitted). The court may also consider the parent's ability to provide the child a safe and permanent home, "the parent's compliance with his or her case service plan, the parent's visitation history with the child, the child's well-being while in care, and the possibility of adoption," *id*. (cleaned up), as well as "how long the child was in foster care or placed with relatives, along with the likelihood that the child could be returned to the parents' home within the foreseeable future, if at all," *In re CJM*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 367565); slip op at 4 (quotation marks and citation omitted). The court must also expressly consider a child's placement with a relative, which ordinarily weighs against termination. *Id*. at ___; slip op at 4.

Regarding respondent-father Martin, JM1, JM2, and JC had previously been in DHHS's care for the same issues that initiated these proceedings, and although respondent-father Martin participated in his case service plan during the first proceedings, it seems clear that he did not benefit from those services given that the children were subsequently placed in DHHS's care for the same issues. See *MJC*, 349 Mich App at 62. And as discussed, throughout the instant proceedings, respondent-father Martin neither meaningfully participated in nor benefitted from his case service plan. See *id*. The caseworker also testified that there was no evidence of a bond between any of the children and respondent-father Martin. The children exhibited negative reactions and emotional distress during and around parenting times with him, and they continually refused to attend parenting time with him. This remained the case even after the children received several months of intensive mental-health treatment and were offered parenting time in a therapeutic setting. The children disclosed that they were subjected to sexual abuse, physical

---

[9] Given our conclusions regarding this statutory ground for termination, we need not address the trial court's findings under MCL 712A.19b(3)(c)(*ii*), (g), and (j). See *Jackisch/Stamm-Jackisch*, 340 Mich App at 333-334.

abuse, and neglect at the hands of their father or other individuals while in their father's care, and all three children reported that they did not wish to return to their father's care and instead wished to be adopted by their respective foster parents, with whom they were closely bonded. JM1 further reported that she would run away if returned to her father's care, and JC's therapist reported that returning JC to her father's care would be very detrimental to her mental health and well-being. And the children's foster parents, for their part, expressed interest in adoption and were unwilling to enter into a guardianship.

Regarding respondent-father Hunt, as discussed previously, he did not meaningfully participate in or benefit from his case service plan. See *id*. The caseworker also testified that there was no apparent bond between respondent-father Hunt and DH, and respondent-father Hunt admitted at the termination hearing that he did not have a bond with DH. The caseworker further testified that respondent-father Hunt only attended 19 parenting times during a 15-month period. And although respondent-father Hunt generally acted appropriately during the parenting times that he did attend, DH cried and tried to leave the visitation room for the first half of each visit and remained visibly uncomfortable throughout the rest of the visit. Respondent-father also admitted at the termination hearing that he did not have appropriate living arrangements for DH if she were to be put in his care. Meanwhile, DH was thriving in foster care, where she had spent her entire life. DH was placed in the same foster home as JM2, with whom she was closely bonded, and all her needs were being met there. DH was also very closely bonded with her foster parents, who wished to adopt her and were unwilling to enter into a guardianship.

Finally, regarding respondent-mother, she, like respondent-father Martin, demonstrated no benefit from the services provided to her during the first proceedings and neither participated in nor demonstrated any benefit from the services offered throughout the instant proceedings. See *id*. The caseworker also testified that there was no demonstrable bond between respondent-mother and the Carter/Martin children, and although respondent-mother demonstrated some bond with the triplets and DM, the bonds were unhealthy, as they had regressed in bathroom training and demonstrated negative behaviors after each parenting time. See, e.g., *In re Peterson*, 331 Mich App 445, 477; 951 NW2d 704 (2020). The Carter/Martin children and the triplets all had significant mental-health needs, but respondent-mother provided no indication that she would continue treatment for those needs if the children were returned to her care. The Carter/Martin children also disclosed significant abuse and neglect while in respondent-mother's care and had repeatedly refused to attend parenting time with respondent-mother throughout the proceedings. All three children further reported that they did not wish to return to their mother's care and instead wished to stay with foster parents. JM1 and JC specifically stated they never wanted to see respondent-mother again, and JC's therapist reported that it would be detrimental to JC's mental health and well-being to return to respondent-mother's care. The triplets and DH were also closely bonded with their respective foster parents, all of whom expressed an interest in adoption and reported that they were unwilling to enter into a guardianship. Further, respondent-mother acknowledged at the time of termination that she was not prepared to have the children return to her care, despite having more than two years to participate in and benefit from the services offered to her to rectify her barriers to reunification. Conversely, all the children's respective foster parents provided the children with a safe, secure, and stable home, and were immediately available to provide permanency through adoption.

In sum, the record reflects that the trial court properly weighed all the evidence available to it at the time that it made its best-interests determination, *Simpson*, ___ Mich App at ___; slip op at 5, and we see no clear error in its findings, *id*. at ___; slip op at 3.

Affirmed.

/s/ Stephen L. Borrello
/s/ Philip P. Mariani
/s/ Christopher M. Trebilcock