*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* NELSON, Minors.

UNPUBLISHED
April 30, 2026
2:45 PM

No. 375411; 375413
Jackson Circuit Court
Family Division
LC No. 13-002874-NA

Before: RIORDAN, P.J., and REDFORD and PATEL, JJ.

PER CURIAM.

These consolidated appeals involve the termination of parental rights. In Docket No. 375411, respondent-mother appeals as of right the order terminating her parental rights to the minor children, JN and TN. Respondent-mother challenges the trial court's findings that reasonable efforts were made toward reunification, that a statutory ground for termination existed under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), and that termination was in the children's best interests. In Docket No. 375413, respondent-father appeals by right the same order terminating his parental rights to JN and TN under MCL 712A.19b(3)(c)(*i*), challenging the trial court's finding that termination was in the children's best interests. For reasons stated herein, we affirm the trial court's termination order in both appeals.

## I. RELEVANT FACTS AND PROCEEDINGS

The Department of Health and Human Services filed an initial petition in September 2023, alleging that respondent-mother physically abused her 10-year-old twin children, including administering beatings with a curtain rod that left marks. Emergency room physicians reported findings consistent with the children's accounts, and Children's Protective Services (CPS) forensic interviews disclosed frequent, painful physical discipline. An amended petition added school-well-being disclosures that respondent-mother verbally abused the children, restricted food, left them alone at night, and used and sold drugs. Respondent-mother pleaded no contest to allegations in the CPS investigative report. The trial court accepted the Department's recommendations and ordered respondent-mother to undergo substance-abuse services, a psychological evaluation, individual therapy, parenting classes, and supervised parenting time at the children's discretion. Respondent-mother's counsel deemed the recommendations reasonable and urged that the

Department encourage the children to agree to parenting time, and placement was made with respondent-mother's sister and her family.

The Department filed a petition in December 2023 to make respondent-father a respondent, which the trial court authorized at a preliminary hearing. At respondent-father's adjudication trial in January 2024, the trial court found that the Department failed to meet its burden, denied the supplemental petition, and ordered the children returned to respondent-father. Within hours of arriving at respondent-father home, the children ran away, prompting CPS to safety plan them out of the home while a Maltreatment in Care investigation proceeded. The investigation concluded that the children would not be at risk if returned to respondent-father, but he was unwilling to take custody. Respondent-father expressed anxiety about potential fabricated allegations impacting his parole and believed that the children needed extensive therapy before they returned to him. A transitional plan failed, and respondent-father stated at a family team meeting in March that he would not provide care or custody at present but would participate in visits and services toward reunification. The caseworker explained what becoming a respondent in the proceeding entailed, including goals and outcomes, and respondent-father said that he understood and was ready to be a respondent. A supplemental petition then sought to make respondent-father a respondent and to keep the children under Department care and supervision. The trial court authorized the petition, and respondent-father was adjudicated after a bench trial. At initial disposition, the trial court ordered respondent-father to obtain a psychological evaluation and follow its recommendations, complete approved parenting classes, comply with parole, maintain appropriate housing with a verified lease, verify income, execute releases, and notify the Department of any changes. The trial court ordered the Department to ensure that family therapy occurred.

Following a January 2024 review hearing, the trial court found that respondent-mother had made no progress toward reunification, so it continued placement and ordered the continuation of reasonable reunification efforts. The trial court noted a dilemma in granting 10-year-olds discretion over parenting time and asked if it was "working." Foster-care case manager Seana Watson reported that she checked in weekly with the children and that JN sometimes visited both parents while TN sometimes visited only respondent-father. Both children were in counseling, and JN was in psychiatric services. At the April 2024 review hearing, respondent-mother requested family therapy, but case manager Watson relayed that both the children's therapist and respondent-mother's therapist reported that their clients were not ready. The children's therapist reported that they remained fearful of respondent-mother, and respondent-mother's therapist reported that respondent-mother did not accept responsibility, denied abuse, believed her behavior justified, and became aggressive when threatened. Watson agreed to keep in contact and recommend family therapy once the therapists deemed their clients ready. At the July 2024 review hearing, respondent-mother disclosed a reading and comprehension disability and a recent cancer diagnosis, and she asserted that her therapist sent a letter requesting that she have parenting time. Watson disputed that characterization, stating that the therapist could not recommend parenting time but supported interactions in a therapeutic setting to gauge potential progress. Discussion followed about informing the children of respondent-mother's cancer diagnosis and whether it would affect their willingness to see respondent-mother.

Family therapy occurred weekly from September 4 to October 16 under respondent-mother's therapist, Valerie Walker. Walker testified that she ended the October 16 session after respondent-mother asked the children if they wanted to be a family because she was dying and did

not want to waste her remaining time. After respondents left, the children told Walker that they did not want parenting-time visits or to complete family therapy, that they did not want to be a family, and that they did not understand why mother was always angry. Walker said that the children became tearful. Walker informed the children that family therapy would not continue and that respondents needed more individual work. At the October review hearing after the family-therapy sessions, the Department sought to remove family therapy from its recommendations, requested that the children have discretion over visits with both respondents, and asked the trial court to schedule an early review. In December, the Department sought to change the permanency goal from reunification to adoption, which respondent-mother opposed by requesting a guardianship or renewed family therapy without father. The trial court ordered the goal change and noted that a guardianship could be explored at the termination hearing. In January 2025, the Department petitioned to terminate parental rights under MCL 712A.19b(3)(c)(*i*), (3)(c)(*ii*) (other conditions), and (3)(j) (reasonable likelihood that child will be harmed if returned to parent).

At the termination hearing, clinical psychologist Dr. Shannon Lowder testified about her evaluations of respondents. She diagnosed respondent-mother with mild depression; a personality disorder with antisocial, borderline, and paranoid components; and post-traumatic stress disorder. Dr. Lowder stated that respondent-mother omitted during the interview facts about her criminal history, case details, and that she lived with respondent-father. Dr. Lowder concluded that respondent-mother was not recommended as a custodial parent because of her mental-health progression and criminality. Dr. Lowder diagnosed respondent-father with antisocial personality disorder and found that he lacked the capacity to parent, had no relationship with the children, and prioritized his relationship with mother. Although Dr. Lowder conceded that respondent-father could learn to parent, she opined that he could not parent alone given his low frustration tolerance, his lack of solo parenting history, and his inability to manage the children's behaviors.

Case manager Watson testified that 62% of respondent-mother's drug screens were missed or positive, with 7 of 43 positive for cocaine, and that respondent-mother denied cocaine use and blamed the positive results of drug screens on contaminated street marijuana. Watson stated that respondents did not verify their income or their new housing location, TN never elected to attend parenting time with mother, JN stopped attending parenting time with respondent-mother by January 2024, and father attended only 20% of his weekly visits from May to October 2024. Although respondent-father disputed this percentage, he conceded that his parenting-time record was poor. Watson testified that the children did not want to reunify with respondent-mother because they did not feel safe with her. Watson believed that respondent-mother had not progressed to a point making return of the children safe, nor could she do so within a reasonable time.

Therapist Walker testified that she began treating mother in May 2024 and that respondent-mother had made consistent progress. Walker described the family therapy that ended on October 16, and she stated that she had seen much improvement since then and wanted respondent-mother to have family therapy with the children.

Respondent-mother testified that she had made tremendous progress with Walker and had attended a women's trauma group facilitated by Walker, even though it was not on her list of court-ordered services. Respondent-mother attributed positive cocaine screens to contaminated street marijuana, implied that missed screens were attributable to cancer's disrupting her life for months,

and claimed that recent tests were mostly negative. She criticized Watson's engagement with the case, referred to her difficulties reading and writing, claimed that she had repeatedly requested parenting time and trauma evaluations for the children, and asserted that she had appropriate housing and disability income. Respondent-mother acknowledged that she knew what services were required and that missed screens could be viewed unfavorably. She denied threatening case manager Watson and insisted that she took responsibility for the children's removal, despite Dr. Lowder's report to the contrary.

Respondent-father testified that his relationship with the children was minimal because of his incarceration, described preparations for their return, alleged that their aunt primed the children with false claims that he was a murderer, and stated that he maintained stable work and housing. Respondent-father admitted that his parenting-time record was poor and that he did not take parenting classes, but he affirmed that he could be a dedicated, loving father if given a fair opportunity.

Ruling from the bench, the trial court emphasized respondent-mother's positive drug screens and lack of candor during substance-use assessments, while noting her completion of parenting classes and a psychological evaluation. The trial court highlighted Dr. Lowder's observations that respondent-mother blamed others for the children's removal, showed no empathy for the children's experiences, and was not recommended as a custodial parent. Regarding respondent-father, the trial court noted his resistance to engaging in services, failure to take parenting classes, and poor attendance at parenting-time between May and October 2024. The trial court also recounted Walker's description of the final family-therapy session. The trial court found clear and convincing evidence supporting termination under MCL 712A.19b(3)(c)(i).

The trial court also found that termination was in the children's best interests, noting that it was their third time in care and that their relationships with respondents were not improving but deteriorating, as shown in the last family-therapy session. The trial court acknowledged that the children were placed with a relative but concluded that relative placement did not weigh against termination because the children were with respondent-mother's sister, with whom mother had a strained relationship, and the relative was willing to adopt. The trial court entered an order terminating respondents' parental rights. Respondents filed separate appeals, which this Court consolidated for judicial efficiency.[1]

## II. DISCUSSION

### A. STATUTORY GROUNDS

Respondent-mother argues that the trial court clearly erred by finding that clear and convincing evidence established grounds for termination under MCL 712A.19b(3)(c)(i). We disagree.

---

[1] *In re Nelson Minors*, unpublished order of the Court of Appeals, entered May 6, 2025 (Docket Nos. 375411 and 375413).

Appellate courts review for clear error a trial court's decision that a ground for termination has been proven by clear and convincing evidence. *In re Trejo Minors*, 462 Mich 341, 356-357; 612 NW2d 407 (2000). See also MCR 3.977(K). A finding is clearly erroneous if, although there is evidence to support it, this Court is left with a "definite and firm conviction" that a mistake was made. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010) (quotation marks and citation omitted). "Further, regard is to be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." *In re Ellis*, 294 Mich App 30, 33; 817 NW2d 111 (2011).

The trial court terminated respondent-mother's parental rights under MCL 712A.19b(3)(c)(*i*), which supports termination when "182 or more days have elapsed since the issuance of an initial dispositional order" and the trial court finds by clear and convincing evidence that "[t]he conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age."

There is no dispute that more than 182 elapsed between the initial disposition order and the termination hearing. The conditions that led to respondent-mother's adjudication were her physical abuse of the children and mental-health concerns underlying that abuse and displayed by the lack of emotional regulation that respondent-mother exhibited toward workers who were trying to investigate reports of the abuse.

The record supports the trial court's finding that the conditions that led to adjudication continued to exist, specifically, respondent-mother's damaging lack of emotional regulation. Therapist Walker testified that respondent-mother had consistently improved since they began working together in May 2024. However, in light of respondent-mother's question to the children at the family-therapy session on October 16, 2024, Walker conceded that respondent-mother had not progressed to the point at which she was ready for family therapy. Walker acknowledged that she did not know whether the children were ready for family therapy or even wanted to have a relationship with either respondent. Accordingly, even if Walker believed that respondent-mother was ready for family therapy, it had yet to be demonstrated that the emotional-regulation barrier to reunification had been resolved.

Also weighing heavily in the trial court's decision was the psychologist's observations that respondent-mother blamed others for the children's removal and showed no empathy for what they had experienced because of her poor decisions, as well as the psychologist's conclusion that respondent-mother was not recommended for consideration as a custodial parent. The trial court acknowledged that respondent-mother had found a therapist with whom she worked well, but in light of the deficits that respondent-mother faced and the fact that it was unclear when or whether family therapy could proceed, let alone be successful, it was reasonable to believe that considerable time still would be needed to overcome the barriers to reunification. The children were 11 years old at the time of the termination hearing, and this was their third removal. The language of MCL 712A.19b(3)(c)(*i*) should not be interpreted to mean that the Legislature intended children to be left indefinitely in foster care. See *In re Dahms*, 187 Mich App 644, 647; 468 NW2d 315 (1991).

## B. REASONABLE EFFORTS

Respondent-mother contends that the trial court clearly erred by finding that the Department made reasonable efforts at reunification when parenting time was at the children's discretion. Given the particular circumstances of this case, we do not find respondent-mother's argument persuasive.

Under the probate code, the Department "has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *In re Hicks/Brown*, 500 Mich 79, 85; 893 NW2d 637 (2017), citing MCL 712A.18f(3)(b) and (c), and MCL 712A.19a(2). Pertinent to the present case, in a child protective proceeding under MCL 712A.2(b), the Department is required to provide a case service plan that provides for parenting time. Specifically, "unless parenting time, even if supervised, would be harmful to the child as determined by the court under [MCL 712.13a] or otherwise, [the plan must include] a schedule for regular and frequent parenting time between the child and his or her parent, which shall not be less than once every 7 days." MCL 712A.18f(2)(e).

The record in the present case suggests that the Department's efforts were reasonable under the circumstances. The trial court believed that forced parenting time would be harmful to the children's well-being, but the court also was aware that parenting time was necessary for reunification. Initially, all parties agreed with case manager Watson's recommendation to allow the children to decide if they wanted to attend parenting time. The trial court and the Department worked toward resolving the children's refusal to attend parenting time under the guidance of the children's therapist and respondent-mother's therapist. The trial court and all parties agreed that family therapy was necessary once respondent-mother and the children were ready, and the Department could arrange for family therapy. As already described, family therapy occurred in September and October 2024, but it ultimately was not successful. On this record, respondent-mother has not established that the Department did not offer reasonable services with respect to parenting time.

Respondent-mother also contends that the trial court clearly erred by finding that the Department made reasonable efforts at reunification when the Department did not accommodate her reading difficulties. This argument lacks merit.

The Department has obligations under the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq*., "that dovetail with its obligations under the Probate Code." *In re Hicks/Brown*, 500 Mich at 86. The Department cannot meet its obligation to provide reasonable services if it does not accommodate a disability under the ADA. *Id*. When challenging the services offered on the basis that the Department violated the ADA, a respondent must establish that he or she would have fared better if other services had been offered. See *In re Sanborn*, 337 Mich App 252, 266; 976 NW2d 44 (2021).

Respondent-mother has not established that she would have fared better if other services had been offered. See *id*. Respondent-mother asserts that she was given service that required a lot of reading. She further asserts that case manager Watson was too busy to help her understand her treatment plans, the psychological evaluation, or any other document. However, at the termination hearing, respondent-mother testified that she had a high-school diploma;

acknowledged that she received a letter from case manager Watson in October 2023 identifying the services that she was required to complete; and affirmed that she understood those services and what was required, including that the trial court could consider missed drug screens as positives. Although respondent-mother's psychological evaluation may have required extensive reading, Dr. Lowder testified that the assessment tools were written at a fourth- or fifth-grade level, that respondent-mother did not have any problem independently reading and completing two portions of the evaluation, and that the rest of the evaluation was read to her. Respondent-mother indicated that she disagreed with the psychological evaluation because it contained a number of errors, not because she had not read or understood it. As to respondent-mother's not understanding her treatment plan, the record shows that respondent-mother refused to sign her initial parent-agency treatment plan (PATP) after Watson explained it to her because she disagreed with it, not because she did not understand it. The record also shows that respondent-mother frequently refused to meet with Watson to discuss the case and her quarterly PATPs. Given the foregoing and considering that respondent-mother refused numerous opportunities to meet and discuss her case with Watson, respondent-mother has not established that she would have fared better if other services had been offered. See *id*.

Respondent-mother also argues that the trial court erred by finding that the Department provided reasonable efforts when the Department did not accommodate her cancer diagnosis. Respondent-mother asserts that the Department should have excused missed drug screens and should have helped her with the depression she experienced as a result of her diagnosis.

Assuming for the sake of argument that the Department was obligated to make reasonable accommodations for respondent-mother's cancer diagnosis, case manager Watson testified at the termination hearing that the Department did, in fact, excuse drug screens that respondent-mother missed because she had a doctor's appointment, as well as screens missed for various other reasons. Further, although the Department knew that mother had been diagnosed with cancer, there is no record evidence that the Department was aware that the cancer diagnosis had triggered a period of depression sufficiently severe to constitute a disability under the ADA. The Department was not required to accommodate a disability that it did not know about or suspect. See *id*. Given the services that were offered, respondent-mother has not established that she would have fared better if other services had been offered. See *id*.

In light of the foregoing, we conclude that the trial court did not clearly err when it found that the Department made reasonable efforts at reunification or that clear and convincing evidence established statutory grounds to terminate respondent-mother's parental rights under MCL 712A.19b(3)(c)(*i*).[2]

---

[2] Respondent-father does not argue that the statutory grounds for termination were not proved. "The failure to brief the merits of an allegation of error is deemed an abandonment of an issue." *In re JS & MS*, 231 Mich App 92, 98; 585 NW2d 326 (1998), overruled in part on other grounds *In re Trejo*, 462 Mich at 353-354. Accordingly, we may assume for purposes of this decision that the trial court "did not clearly err in finding clear and convincing evidence of the . . . statutory grounds for termination from MCL 712A.19b(3)." *In re JS & MS*, 231 Mich App at 98-99.

## C. BEST INTERESTS

Both respondents assert that the trial court erred by finding that termination was in the children's best interests. In addition, respondent-father specifically argues that the children should have been placed in a guardianship with their aunt, with whom they resided during the proceeding. We again disagree.

"This Court reviews a trial court's determination regarding best interests for clear error." *In re Keillor*, 325 Mich App 80, 93; 923 NW2d 617 (2018). This Court reviews for an abuse of discretion a trial court's determination regarding the propriety of a guardianship. See *In re COH*, 495 Mich 184, 202; 848 NW2d 107 (2014). "An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes." *Id*. (quotation marks and citation omitted).

If the trial court finds "that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). The trial court must find by a preponderance of the evidence that termination of parental rights is in a child's best interests. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). In making its best-interest determination, a trial court may consider "the child's bond to the parent; the parent's parenting ability; the child's need for permanency, stability, and finality; and the advantages of a foster home over the parent's home." *In re Gonzales/Martinez*, 310 Mich App 426, 434; 871 NW2d 868 (2015) (cleaned up). The trial court also may consider "the parent's compliance with treatment plans, the child's well-being in care, and the possibility of adoption." *In re Sanborn*, 337 Mich App at 277.

The children were 11 years old at the time of the termination hearing and had been removed from respondent-mother's care three times. That any bond that the children had with respondent-mother was weak is suggested by the fact that JN rarely chose to attend parenting time with respondent-mother, and TN refused parenting time with her. There is no evidence that the children were particularly bonded with respondent-father. The fact that the children had been removed from respondent-mother's care every few years since their birth weighed in favor of their need for permanency, stability, and finality. The lawyer-guardian ad litem consistently testified that the children were doing well in their placement, and case manager Watson indicated that the placement was meeting the children's medical, dental, psychological, and social needs and was willing to adopt. On this record, and considering that the child is the focus of a best-interest determination, not the parent, *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016), superseded by statute on other grounds as noted in *In re Boshell/Shelton*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 371973); slip op at 10, it cannot be said that the trial court clearly erred by finding that the termination of respondents' parental rights was in the children's best interests.

Respondent-mother contends that the trial court's analysis was flawed in various ways. But, having reviewed her arguments, we conclude that none of them leave us with a "definite and firm conviction" that a mistake was made in the trial court's analysis. *In re Mason*, 486 Mich at 152 (quotation marks and citation omitted).

Respondent-father argues that the trial court erred by not considering each child's interests separately. In particular, respondent-father contends that the children were not similarly situated, as JN was willing to meet with respondent-mother and respondent-father, whereas TN had reservations about meeting respondents, respondent-mother in particular. This argument also lacks merit.

"[I]f the best interests of the individual children *significantly* differ, the trial court should address those differences when making its determination of the children's best interests." *In re White*, 303 Mich App 701, 715; 846 NW2d 61 (2014). Respondent-father implies that JN's willingness to attend parenting time with respondents suggested that she had a closer parent-child bond with respondents than did TN and that this was a significant difference that weighed against finding that termination of respondents' parental rights was in JN's best interests. However, according to respondent-father's logic, JN's refusal to attend parenting times after seven or eight visits suggested that there ultimately was no significant difference in the children's bond with respondent-mother. As to respondent-father, the children initially lacked the discretion to attend parenting time with him. However, after being given that discretion in late 2024, neither child chose to attend parenting time with respondent-father. The record does not support respondent-father's implication that differences in the children's bonds with respondents necessitated separate analyses of the children's best interests.

Respondent-father's argument that the trial court erred by not considering a long-term guardianship in lieu of termination is equally without merit. Case manager Watson testified that the children's placement would be willing to adopt if the trial court terminated respondents' parental rights, but there was no evidence that the placement was willing to enter into a guardianship. Michigan courts cannot compel a relative to become a guardian; guardianship requires voluntary acceptance by the proposed guardian. See *In re Simpson*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 368248); slip op at 7; *In re Rippy*, 330 Mich App 350, 359; 948 NW2d 131 (2019). Given that no application for guardianship had been filed, and there was no record evidence that the placement would have agreed to a guardianship, the trial court did not abuse its discretion by not ordering a guardianship. See *In re COH*, 495 Mich at 202; *In re Simpson*, ___ Mich App at___; slip op at 7; *In re Rippy*, 330 Mich App at 359.

Respondent-father also argues that the children's placement with a relative should have weighed against termination. A child's placement with relatives can weigh against termination. *In re Olive/Metts*, 297 Mich App 35, 43; 823 NW2d 144 (2012). However, "that fact is not dispositive given that a trial court may terminate parental rights in lieu of placement with relatives if it finds that termination is in the child's best interests." *In re Atchley*, 341 Mich App 332, 347; 990 NW2d 685 (2022) (quotation marks and citation omitted). The trial court considered that the children were placed with respondent-mother's sister but determined that relative placement did not weigh against termination being in the children's best interests. Respondent-mother's relationship with her sister was strained, and the sister was willing to adopt the children, but there is no evidence that she was willing to enter into a guardianship arrangement. Given the trial court's overall analysis, we are not left with a "definite and firm conviction" that a mistake was made. *In re Mason*, 486 Mich at 152 (quotation marks and citation omitted).

For the foregoing reasons, we conclude that the trial court did not clearly err by finding that the termination of respondents' parental rights was in the children's best interests.

## III.  CONCLUSION

In both appeals, we affirm the trial court's termination of parental rights.

/s/ Michael J. Riordan
/s/ James Robert Redford
/s/ Sima G. Patel